DEBORAH A. SIVAS (CA Bar No. 135446)
MATTHEW J. SANDERS (CA Bar No. 222757)
STEPHANIE L. SAFDI (CA Bar No. 310417)
ENVIRONMENTAL LAW CLINIC
Mills Legal Clinic at Stanford Law School
Crown Quadrangle, 559 Nathan Abbott Way
Stanford, California 94305-8610
Telephone:  (650) 725.8571
Facsimile:  (650) 723.4426
dsivas@stanford.edu
matthewjsanders@stanford.edu
ssafdi@stanford.edu

Attorneys for Plaintiff NATIONAL PARKS
CONSERVATION ASSOCIATION

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## (Eastern Division)

| | |
|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES BUREAU OF LAND MANAGEMENT; TRACY STONE-MANNING, Director of United States Bureau of Land Management; and KAREN MOURITSEN, Bureau of Land Management California State Director,<br><br>Defendants. | Case No. 5:23-cv-1844<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**<br><br>[National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*; Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq.*] |

## INTRODUCTION

1.     In August 2018, the Bureau of Land Management ("BLM") granted private developer Eagle Crest Energy Company ("Eagle Crest") a right-of-way ("ROW") to construct and operate a transmission line and a water pipeline in the middle of the California desert, on the eastern edge of Joshua Tree National Park. The ROW traverses 1,150 acres of federal public lands managed by BLM.  If built, the water pipeline would transport groundwater to Eagle Crest's proposed Eagle Mountain Hydroelectric Pumped Storage Project ("Pumped Storage Project").  The transmission line would connect the Pumped Storage Project to California's transmission grid.

2.     In 2014, Eagle Crest received a license to construct and operate the Pumped Storage Project from the Federal Energy Regulatory Commission ("FERC") pursuant to the Federal Power Act, 16 U.S.C. § 791 *et seq*.  The Pumped Storage Project is slated to occupy approximately 2,700 acres of public and private land and produce up to 1,300 megawatts of energy.

3.     The public lands comprising the ROW sit at the edge of the Eagle Mountains, near the town of Desert Center in Riverside County.  This remote region, where the Mojave and Sonoran Deserts meet, is defined by rare desert landscapes and habitats that provide shelter, food, and genetic connectivity for countless plants and animals.  Many of these species, including the federally threatened desert tortoise, are on an accelerating path to extinction.  The California desert is extremely fragile; habitats take hundreds of years to form and can take just as long to recover from human disturbances.  The region also has few (and therefore precious) water sources, including the Chuckwalla Valley Aquifer, from which the Pumped Storage Project is expected to draw 35 billion gallons over its 50-year lifetime—enough water to fill and drain the Rose Bowl every six weeks over the same 50-year period.

4.     The National Park Service has officially recommended reintegrating the area where the Pumped Storage Project and right-of-way are planned into Joshua

Tree National Park.  The Park spans 800,000 acres and welcomes more than three million visitors each year, making it the eighth most-visited park in the National Park System.  The many animal and plant species that live there, including the iconic Joshua tree, are uniquely adapted to the Park's conditions but are increasingly threatened by climate change, drought, loss of habitat outside the Park, and other environmental pressures.  The Park also provides unparalleled opportunities for recreation and cultural resource preservation.

5.     It has been nearly 10 years since Eagle Crest received its Federal Power Act license to construct and operate the Pumped Storage Project.  Eagle Crest has yet to begin construction or find a buyer for the Project's energy.  During the past decade, any need there was for the Pumped Storage Project's energy has since dwindled.  California's aggressive efforts to fight climate change depend in significant part on renewable energy and long-duration energy storage, and pumped storage is one such storage technology.  However, the Pumped Storage Project is by itself larger than California's entire statewide target to deploy approximately 1,000 megawatts of long-duration storage by 2032.  Furthermore, the Pumped Storage Project would operate in the remote desert, far away from cities where electricity demand is highest, and where the desert's extreme temperatures will create significant water and transmission power loss compared with projects in coastal California.  California's electricity regulators and legislators have opposed and blocked numerous efforts by Eagle Crest and its parent company, NextEra Energy Resources, to force California ratepayers to finance the multi-billion-dollar Pumped Storage Project, choosing instead to advance projects that are better tailored to California's needs.

6.     Under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*., BLM must thoroughly evaluate and disclose the environmental effects of any proposed development, including the ROW.  Under the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq*., BLM must protect the

resources under its care from "unnecessary and undue degradation." This protective standard is even stronger in the California desert, where the governing land use plan, the California Desert Conservation Area Plan ("CDCA Plan"), protects the desert's fragile resources from "undue impairment." In conducting this review and deciding whether to grant the ROW, BLM was obligated to consider the ROW's direct, indirect, and cumulative impacts.

7.    Instead of conducting a thorough review of the ROW's impacts, in early 2017 BLM issued an Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI"). Then, in August 2018, BLM issued a Decision Record approving the ROW, as well as a Land Use Plan Amendment ("LUPA") to the CDCA Plan that waived or weakened many of the Plan's most important conservation mandates.

8.    To substantiate its limited environmental review and no-significant-impact finding, BLM latched onto the environmental review that FERC had prepared several years before for the Pumped Storage Project license. Numerous agencies and commentors, including BLM itself, had previously faulted FERC for inadequately analyzing the Project's effects, particularly on the limited supply of groundwater in the Chuckwalla Valley Aquifer. BLM's decision to "tier" to FERC's inadequate analysis infected BLM's environmental review of the ROW.

9.    BLM's environmental review was also predicated on an unduly narrow "purpose and need" that prioritized Eagle Crest's preferences and ignored BLM's legal mandate to conserve desert resources. This choice, in turn, led BLM to consider an unreasonably narrow range of alternatives. BLM also failed to take a "hard look" at the ROW's impacts, as controlling Ninth Circuit decisions require, and failed to acknowledge the significance of those impacts. BLM ended up approving a ROW that will cause undue degradation and impairment under FLPMA.

10.    In light of these legal errors, BLM's Decision Record approving the ROW and accompanying LUPA, as well as its underlying environmental review,

should be vacated with directions to BLM to undertake a new, legally adequate environmental review and decision-making process.  BLM and the public must fully understand the significant impacts of the ROW and LUPA before an unnecessary industrial energy project degrades, for the rest of our lifetimes and likely much longer, a large swath of one of California's most precious landscapes.

## JURISDICTION

11.     This action arises under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq*.  The Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question), § 1346 (United States as defendant), and/or § 1361 (action to compel officer of United States to perform duty).

## VENUE

12.     Venue is properly vested in this Court under 28 U.S.C. § 1391(e) because (a) Plaintiff National Parks Conservation Association resides in and maintains an office in this District, (b) the project at issue in this action is located in this District, and (c) the BLM offices that prepared the NEPA analysis and issued the Decision Record for the ROW and LUPA are located in this District.

## INTRADISTRICT ASSIGNMENT

13.     Under General Order No. 21-01 § I.B.1.a(1)(b), this action is properly assigned to the Eastern Division of this District because (a) the sole plaintiff, National Parks Conservation Association, resides in and maintains an office in San Bernardino County, and (b) the project at issue in this action is located in Riverside County, which is in the Eastern Division of this District.

## PARTIES

14.     Plaintiff NATIONAL PARKS CONSERVATION ASSOCIATION ("NPCA") is the nation's only non-profit organization committed solely to protecting and enhancing the National Park System for current and future generations.  NPCA is a non-profit, 501(c)(3) organization headquartered in Washington, D.C., with 11 regions and 27 programmatic field locations, including a location in Joshua Tree,

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

California.  The organization has more than 1.6 million members and supporters, including many who reside in, explore, and enjoy the native species and ecosystems of the California desert and Joshua Tree National Park.

15.    NPCA brings this action on its own institutional behalf and on behalf of its members, many of whom regularly enjoy educational, recreational, and scientific activities within the areas of the California desert in which the Pumped Storage Project would be located.  The interests of NPCA and its members in visiting, studying, and otherwise enjoying Joshua Tree National Park and the California desert have been and continue to be harmed by Defendants' actions.

16.    Defendant U.S. BUREAU OF LAND MANAGEMENT ("BLM") is a federal agency within the Department of the Interior ("DOI").  BLM is responsible for the administration of the federal public lands at issue in this case.  BLM is charged with managing federal public lands, including the lands subject to the ROW and LUPA, in accordance with the principles of multiple use and sustained yield and in a manner consistent with all applicable laws.

17.    Defendant TRACY STONE-MANNING is the Director of BLM and is ultimately responsible for overseeing BLM's administration of the federal lands under BLM's jurisdiction, including the ROW and LUPA at issue in this case.  She is sued in her official capacity.

18.    Defendant KAREN MOURITSEN is the BLM's State Director for California and is responsible for overseeing BLM's administration of the federal lands under BLM's jurisdiction in California, including the ROW and LUPA at issue in this case.  She is sued in her official capacity.

## LEGAL BACKGROUND

**A.    Administrative Procedure Act**

19.    The APA entitles "adversely affected or aggrieved" persons, 5 U.S.C. § 702, to judicial review of "final agency action," *id*. § 704.

20.     The APA compels a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

**B.     National Environmental Policy Act**

NEPA's Policy and Purpose

21.     NEPA is intended to "promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321.  NEPA ensures that agencies take a "hard look" at the environmental consequences of their proposed actions and center public participation in their decision-making.

22.     In 1978, the White House Council on Environmental Quality ("CEQ") promulgated regulations to implement NEPA, which are codified at 40 C.F.R. § 1500 *et seq*.  On September 14, 2020, CEQ revised the 1978 regulations.  The 1978 regulations govern in this case because BLM issued its Decision Record in this case on August 1, 2018, before the 2020 update went into effect.  *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304 (July 16, 2020); 40 C.F.R. § 1506.13 (2020); *see also* Electronic Code of Federal Regulations: Title 40, https://www.ecfr.gov/on/2018-08-01/title-40/chapter-V (displaying the CEQ NEPA regulations in effect as of August 1, 2018).  Accordingly, all citations to the CEQ regulations in this complaint are to the version in effect as of August 1, 2018, unless otherwise noted.

23.     In 2008, DOI promulgated regulations to implement NEPA, which are codified at 43 C.F.R. § 46.10 *et seq*.  These regulations work in tandem with the CEQ regulations.  Accordingly, all citations to the DOI regulations in this complaint are to the version in effect as of the date of filing of this complaint.

24.     DOI and BLM have published guidance to implement NEPA, specifically the DOI Departmental Manual, *Managing the NEPA Process - Bureau of Land Management* (May 8, 2008) ("BLM Manual"), and the BLM National Environmental Policy Handbook H-1790-1 (Jan. 30, 2008) ("BLM Handbook").

<u>Environmental Impact Statements and Environmental Assessments</u>

25.     NEPA and its implementing DOI regulations require an agency to prepare an Environmental Impact Statement ("EIS") for any "major Federal action" that significantly affects the environment before deciding whether to proceed with the action.  42 U.S.C. § 4332(C); 43 C.F.R. § 46.400.  A "major Federal action" is an "activity or decision subject to Federal control and responsibility," typically taking the form of an official policy adoption, a formal plan or program adoption, or federal approval or undertaking of a proposed project.  40 C.F.R. § 1508.1(q) (current).

26.     CEQ's and DOI's regulations allow officials to prepare an EA to help them determine whether to prepare an EIS or issue a FONSI.  *See* 40 C.F.R. § 1501.4; 43 C.F.R. § 46.300.  However, the BLM Manual states that EAs are inappropriate, and an EIS is required, for any land use plan amendment to a BLM Land and Resource Management Plan (colloquially known as a "land use plan") where the amendment has or may have potentially significant impacts.  *See* BLM Manual at 11.7(E); *see also* 40 C.F.R. § 1501.3(a).

27.     To determine whether an impact is "significant" under NEPA, an agency must consider an action's "context" and each impact's "intensity."  40 C.F.R. § 1508.27.  Context "means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality."  *Id.* § 1508.27(a).  Intensity refers to the severity of the impact.  *Id.* § 1508.27(b).  In evaluating intensity, agencies must consider the degree to which an action is likely to be highly controversial, to be uncertain, or to involve unique or unknown risks.  *Id.* § 1508.27(b)(4)-(5).

28.     An action is "highly controversial" if there is "substantial dispute about the size, nature or effect" of the action.  An action involves unique or uncertain risks where there are insufficient data to determine the action's impacts on the surrounding environment.  An EIS must be prepared where uncertainty around the environmental impacts can be resolved by further data collection.

Purpose and Need and Range of Alternatives

29. NEPA requires EISs and EAs to contain a statement of purpose and need to which the agency is responding. 40 C.F.R. §§ 1501.5(c), 1508.9, 1502.13 (all current); 43 C.F.R. § 46.310(a)(2); BLM Handbook, at 35; BLM Manual at 11.7(B)(1); *see also* 40 C.F.R. § 1502.13 ("The statement shall briefly specify the underlying purpose and need to which the agency is responding . . . .").

30. A purpose and need statement is unreasonably narrow if it foregrounds the applicant's interests and therefore excludes alternatives that fail to meet those interests. To reinforce this point, CEQ has recently updated the NEPA regulation on purpose and need to clarify that an agency may not inappropriately constrain its discretion by prioritizing an applicant's goals in constructing a purpose and need statement. *See* 87 Fed. Reg. 23,453, 23,458 (Apr. 20, 2022) (codified at 40 C.F.R. § 1502.13 (current) and 40 C.F.R. § 1508.1(z) (current)).

31. An agency's purpose and need statement most directly informs an agency's discretion by influencing the range of alternatives that an agency must consider. The purpose and need statement may not unreasonably narrow the range of alternatives such that the ultimate decision made by the agency becomes preordained.

32. More generally, NEPA requires an agency to consider a reasonable range of alternatives to a proposed action in an EIS or EA, such that the agency may make an informed choice about whether and how to proceed. 42 U.S.C. § 4332(C)(iii); 43 C.F.R. §§ 46.310(a)(4), 415(b). An agency must "study, develop, and describe appropriate alternatives" regardless of whether it prepares an EA or an EIS. There must be a meaningful difference between the alternatives considered. Finally, to be able to make a clear choice among alternatives, an agency must consider a "no action" alternative. 40 C.F.R. § 1502.14(d).

33. An agency must discuss the reasons for eliminating an alternative from detailed analysis in an EIS. *Id.* § 1502.14(a); 43 C.F.R. § 46.420(c). The BLM Handbook calls for the same procedure for an EA. BLM Handbook at 52.

Tiering

34.     "Tiering" allows an agency to incorporate a prior, usually broader NEPA analysis into a subsequent, usually narrower one.  40 C.F.R. § 1508.28.  Tiering thereby allows an agency to reduce repetition and focus the agency's NEPA analysis on the issues "specific to the [environmental analysis] subsequently prepared."  *Id.*

35.     Tiering is appropriate in only certain circumstances.  DOI's NEPA regulations require that an EIS or EA that tiers to a prior NEPA document "include a finding that the conditions and environmental effects described in the broader NEPA document are still valid or address any exceptions."  43 C.F.R. § 46.140.  If any of the analysis in the prior NEPA document "is not sufficiently comprehensive or adequate to support further decisions, the tiered NEPA document must explain this and provide any necessary analysis."  *Id.* § 46.140(b).

36.     If, as part of tiering, a prior NEPA document is "used in its entirety," the agency must evaluate "whether new circumstances, new information or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects."  *Id.* § 46.120.

Hard Look Requirement

37.     When preparing either an EA or an EIS, an agency must analyze all reasonably foreseeable environmental impacts of the proposed action, including direct, indirect, and cumulative impacts.  40 C.F.R. §§ 1508.8-.9.

38.     Per the BLM Handbook, an "effects analysis must demonstrate that the BLM took a 'hard look' at the impacts of the action.  The level of detail must be sufficient to support reasoned conclusions by comparing the amount and the degree of change (impact) caused by the proposed action and alternatives."  BLM Handbook at 55.

39.     In evaluating potential environmental impacts, BLM must also "insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements."  40 C.F.R. § 1502.24.  "If there is

substantial dispute over models, methodology, or data, [BLM] must recognize the opposing viewpoint(s) and explain the rationale for [its] choice of analysis." BLM Handbook at 55.

40.     Agencies must take a "hard look" at the potential impacts of a proposed action. In the Ninth Circuit, the "hard look" standard means that an agency's environmental analysis must be "more than perfunctory," must rely on "accurate scientific analysis," and must not minimize adverse impacts.

41.     An agency's evaluation of cumulative impacts must analyze the "incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. DOI defines "reasonably foreseeable" as likely enough to occur such "that a Responsible Official of ordinary prudence would take such activities into account in reaching a decision." 43 C.F.R. § 46.30. Reasonably foreseeable future actions include "federal and non-federal . . . activities for which there are existing decisions, funding, or proposals identified by [BLM]." BLM Handbook at 59.

Supplemental EIS

42.     An agency must supplement its existing NEPA analysis where, among other things, there are "significant new circumstances or information" affecting a proposed action's environmental impacts and "a major Federal action remains to occur." 40 C.F.R. § 1502.9(d) (current).

C.     Federal Land Policy and Management Act

43.     FLPMA directs BLM to manage the public lands under its jurisdiction "in a manner that will protect the quality of the scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8). BLM must prevent "unnecessary or undue degradation of the lands." Id. § 1732(b). FLPMA also requires BLM to manage public lands on the basis of "multiple use and sustained yield," which involves "harmonious and coordinated management of the various resources without

permanent impairment of the productivity of the land and the quality of the environment." *Id.* §§ 1701(a)(7), 1702(c).

44.     FLPMA directs BLM to give special protection to Areas of Critical Environmental Concern ("ACECs"). *Id.* §§ 1701(a)(11), 1702(a).  Accordingly, BLM must manage ACECs for conservation. *See* Agreement By and Between the United States Bureau of Land Management and the California Department of Fish and Wildlife, C.1 (October 2, 2015).  BLM must specifically protect, and prevent irreparable damage to, the wildlife, habitats, and/or other natural resources for which an ACEC has been designated.  43 U.S.C. § 1702(a).

45.     In 1976, Congress recognized that the California desert is an "extremely fragile" environment, created the California Desert Conservation Area ("CDCA"), and directed BLM to prepare a land use plan for the CDCA. *Id.* § 1781(c)-(d).  Pursuant to this statutory directive, BLM published a land use plan ("CDCA Plan") in 1980.  The CDCA Plan's primary goal is to "enhance wherever possible . . . the environmental, cultural, and aesthetic values of the Desert."  The CDCA Plan encourages "erring on the side of conservation in order to not risk today what we cannot replace tomorrow."

46.     To further the CDCA Plan's conservation mandate, Congress included in FLPMA a standard even more stringent than FLPMA's general "unnecessary or undue degradation" standard.  FLPMA accordingly requires the Secretary to "protect the scenic, scientific, and environmental values of the public lands of the [CDCA] against undue impairment." *Id.* § 1781(f).  FLPMA also requires BLM to manage public lands in the CDCA in a manner that provides for the "immediate and future protection and administration of the public lands in the California desert within the framework of a program of multiple use and sustained yield, and the maintenance of environmental quality. *Id.* § 1781(b).  Failure to adhere to the CDCA Plan violates FLPMA. *Id.* § 1781(d).

47.     In 2016, BLM amended the CDCA Plan through the Desert Renewable Energy Conservation Plan ("DRECP").  The DRECP identified areas that may be suitable for renewable energy project development, designated new ACECs, and created conservation management actions to set goals and conditions for resource development, use, and conservation within ACECs and other designated areas.

## FACTUAL BACKGROUND

48.     The following sections provide the factual background necessary to understand BLM's environmental review of the right-of-way ("ROW") at issue in this case.  Section A describes the landscape surrounding the ROW area and the history of the Eagle Mountain region.  Sections B and C describe the Pumped Storage Project and FERC's associated environmental review, which BLM relied on heavily in its environmental review for the ROW.  Sections D, E, and F discuss the ROW and BLM's environmental review.

**A.     Setting and History**

49.     The landscape within and surrounding the ROW is characterized by especially valuable desert habitats, including "Desert Dry Wash Woodland" and "Sonoran Creosote Bush Scrub."  Desert Dry Wash Woodland consists of tall, mostly leguminous trees in "dry washes," which are channels that are typically dry but occasionally experience flows of running surface water, often in the form of flash floods.  Trees in this habitat type include ironwood trees, which can live to 800 years and yield wood so dense it sinks in water.  Ironwood trees provide shade, food, and other habitat values that nurture at least 500 desert plants and animals.  The ROW directly traverses Desert Dry Wash Woodland habitat as well as washes that sustain this habitat.

50.     Sonoran Creosote Bush Scrub occurs in the uplands between dry washes.  This habitat type is comprised of long-lived woody shrubs, cacti, and other succulents, as well as annual and short-lived perennial flowering plants.  The soil surfaces of these areas, which include desert "pavement" and living cryptobiotic soil

crusts, take centuries to form and are extremely vulnerable to physical disruption. Plant heights do not reach beyond six feet high and are usually much shorter.

51.     The threatened desert tortoise uses both Sonoran Creosote Bush Scrub and Desert Dry Wash Woodland for foraging.  Desert tortoises favor the edges of Desert Dry Wash Woodland for digging their burrows.  Although bighorn sheep tend to spend most time in the mountains above both habitats, they forage in them; desert acacia, a favored food, grows almost exclusively in dry washes.  Bighorn sheep also use the taller vegetation in Desert Dry Wash Woodland as cover to move from one mountain range to another.

52.     The ROW crosses through the Chuckwalla ACEC—"the most outstanding representative of the Colorado Desert in California."  The Chuckwalla ACEC encompasses the Orocopia, Chuckwalla, Little Chuckwalla, and Palo Verde Mountains and the alluvial fans, washes, and valleys that weave between them.  The ACEC contains the complete range of wildlife and plant species characteristic of the Colorado Desert— some 158 plant species, among the most botanically diverse in the California Desert.  Some of these species are found nowhere else in the world, including the Mecca aster, a long-stemmed plant with lavender-petaled flowers and spiny leaves.  The Chuckwalla ACEC also contains the highest known density of desert tortoises in the entire Sonoran Desert.

53.     The ROW sits just two miles from Joshua Tree National Park.  A critical intersection between several different ecological regions, the Park is home to countless rare species, including the desert tortoise, desert bighorn sheep, desert fan palms, and more than 700 plant species, including the iconic and imperiled Joshua tree.  Sweeping vistas of ruggedly majestic desert stretch for miles, creating a landscape of incomparable ecological function and beauty.

54.     In 1936, what is now Joshua Tree National Park was first designated as Joshua Tree National Monument, created to protect the area's fragile and precious landscape.  Fifteen years later, however, newly patented mining claims on Eagle

Mountain, on the Monument's southeastern flank, removed significant acreage from the Monument's protection.  In 1994, when the California Desert Protection Act converted the Monument into Joshua Tree National Park, these patented claims remained.  The resulting fragmentation created an awkward carveout that still cuts deep into the Park.

55.    For 40 years, mining company Kaiser Steel Corporation worked the Eagle Mountain mining claims, during which it was the largest iron mine in the western United States.  Kaiser decommissioned the mine in 1983, prompting decades of debate about what to do with the abandoned mining pits on Eagle Mountain.

56.    In 1989, another Kaiser subsidiary, Kaiser Eagle Mountain, proposed building a massive landfill that could accept up to 20,000 tons of garbage per day from the Los Angeles region.  NPCA filed suit against the landfill and prevailed.  In 2010, the U.S. Court of Appeals for the Ninth Circuit held unlawful the federal land exchanges that were necessary to construct the landfill, finally ending the landfill's viability in 2014.  *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058 (9th Cir. 2010).

57.    Today the National Park Service manages Joshua Tree National Park. To preserve the cultural value of Eagle Mountain as a historical mining site, as well as the ecological and scenic values of the Eagle Mountain area, the Park Service has explored annexing the Eagle Mountain area into Joshua Tree National Park.  Doing so would reincorporate lands previously within the National Monument, restoring the ecological integrity of the region.  In a 2016 boundary expansion study ("Boundary Study"), the Park Service concluded that Eagle Mountain was a "key building block for landscape-scale conservation in the California desert." Accordingly, the Department of the Interior administratively withdrew the federal lands that surrounded the Pumped Storage Project area from other uses to facilitate the Park's expansion.  The temporary withdrawal expired in 2018, but the Project area remains a candidate for reintegration into Joshua Tree National Park.

**B.      The Eagle Crest Energy Pumped Storage Project**

58.      A few years before the National Park Service published its Boundary Study, a new private developer proposed a new commercial use of the Eagle Mountain area.  In 2009, Eagle Crest, now a subsidiary of NextEra Energy Resources, proposed building the hydroelectric Pumped Storage Project on approximately 2,700 acres of public and private land adjacent to Joshua Tree National Park.

59.      The term "hydroelectric" can be misleading.  Although the Pumped Storage Project would generate electricity, it is an energy-storage, not an energy-generation, project.  If constructed, the Project would convert Kaiser's two former iron ore mine pits into two water reservoirs, one at a lower elevation and one at a higher elevation.  When electricity demand is low, the Project would draw up to 1,600 megawatts of electricity from the grid to pump water up Eagle Mountain from the lower to the higher elevation reservoir.  When electricity demand is high, the Pumped Storage Project would release the water to flow back down to the lower elevation reservoir through underground turbines, generating up to 1,300 megawatts of electricity.  In these operations the Pumped Storage Project would use more energy than it produces.

60.      California's electricity regulators determine how much of which energy resource is needed, by when and where, and in a manner that protects ratepayers from unnecessary costs.  In 2020, those regulators set a procurement target for long-duration energy storage of roughly 973 megawatts by 2032.  That target remains in place today.

61.      At 1,300 megawatts, the Pumped Storage Project far exceeds this target. The Project would be in the remote California desert, far away from the cities that California's electricity regulators have identified as most in need of long-duration energy storage.  In addition, the desert's extreme temperatures will create significant water and transmission power loss compared to projects elsewhere in California.

62.     As a result of these factors, as of August 2018, when BLM issued the Decision Record approving the ROW and LUPA for the Pumped Storage Project, and still today, Eagle Crest has failed to secure a buyer for the energy the Project would produce.

63.     To try to secure a buyer, Eagle Crest and its parent company, NextEra Energy Resources, have repeatedly tried to increase, through regulation and legislation, the state's procurement target for long-duration energy storage. California's electricity regulators and legislators have consistently opposed these efforts by Eagle Crest and NextEra Energy Resources.

64.     The Pumped Storage Project requires a license from FERC under the Federal Power Act, 16 U.S.C. § 791 *et seq*.  Eagle Crest originally proposed the Pumped Storage Project in 1991, first applied for a license from FERC in 1994, and reapplied for a license in 2009.  FERC granted the Project a license in 2014.

65.     FERC's 2014 license required Eagle Crest to commence construction by June 2016.  However, over the past ten years, Eagle Crest has successfully sought from FERC four extensions and one stay of its commencement- and completion-of-construction deadlines.  Eagle Crest must now begin construction by June 19, 2028, and complete it by June 19, 2031.  Eagle Crest has yet to begin construction.

66.     NPCA has repeatedly sought to intervene in proceedings before FERC, as well as repeatedly opposed Eagle Crest's requests to extend applicable commencement- and completion-of-construction deadlines.  Among other things, NPCA has argued that supplemental NEPA review is required in connection with further discretionary actions by FERC and BLM, including extensions of Eagle Crest's construction deadlines.

C.     **FERC's 2012 EIS for the Pumped Storage Project**

67.     Before granting the Federal Power Act license to construct and operate the Pumped Storage Project, NEPA required FERC to study the Pumped Storage Project's environmental impacts.  FERC's review culminated in a 2012 EIS ("2012

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

FERC EIS").

68.    The 2012 FERC EIS analyzed the environmental impacts of the Pumped Storage Project, and of three different configurations of its transmission line and water supply pipeline proposed by Eagle Crest, the State Water Board, and DOI. Most relevant here are the portions of FERC's EIS concerning groundwater and biological-resource impacts.

69.    In preparing the 2012 FERC EIS, FERC relied on a number of incomplete, outdated, or otherwise inadequate sources.  For example, FERC tiered extensively to the 1997 EIS for the proposed Eagle Mountain Landfill ("Landfill EIS"), even though the Ninth Circuit had held in 2010 that the EIS violated NEPA because it employed an unduly narrow purpose and need statement and failed to take a hard look at eutrophication (excessive nutrient) impacts.  *See Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1070-74 (9th Cir. 2010).  FERC also relied on a 2009 electricity demand forecast by the North American Electric Reliability Corporation to support a finding that energy demand in the region was growing.  However, the forecast covered only the years of 2010 through 2019, or before the period the Pumped Storage Project was supposed to (and could now) be operational.

70.    Numerous federal agencies, including the U.S. Environmental Protection Agency ("EPA"), the National Park Service, and BLM itself, expressed serious concerns about the legal adequacy of the 2012 FERC EIS.

71.    For example, EPA gave FERC's draft EIS a troubling score of "EO-2," meaning that the EIS generated "environmental objections" and contained "insufficient information."  In its comments, EPA observed that the draft EIS contained an unduly narrow purpose and need statement and failed to sufficiently analyze how the Pumped Storage Project would affect bighorn sheep migration. Even after FERC published the final EIS in 2012, EPA continued to warn that the EIS failed to resolve EPA's concerns, including about excessive groundwater

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

withdrawals and impacts to bighorn sheep. *See infra* ¶ 96 (discussing EPA's groundwater objections detail).

72.    Similarly, the National Park Service and BLM, sister agencies within the DOI, filed joint comments on the 2012 FERC EIS that criticized FERC's reliance on "insufficient" and "misleading" information.  According to BLM, "there are huge information gaps and broad assumptions made throughout this document.  As a result, analysis is minimal and all of the potential impacts from the proposed project on biological resources are not evaluated."  BLM found FERC's proposed mitigation measures for the desert tortoise and its study of bighorn sheep impacts particularly "inadequate."  BLM also critiqued the "new impacts" of the Pumped Storage Project's proposed transmission line on sensitive desert habitat as "not sufficiently analyzed."

73.    EPA, BLM, and the National Park Service also expressed deep concerns with FERC's groundwater modeling, discussed further in Paragraphs 95-100 below.

74.    Despite these objections, in 2012 FERC finalized its EIS and, in 2014, issued a license for the Pumped Storage Project.

75.    In July 2014, DOI, which oversees BLM and the Park Service, was so concerned about the 2012 FERC EIS's adequacy under NEPA that it asked FERC to stay the license and reconsider its issuance.  DOI warned that "necessary information concerning resources under its jurisdiction has not been made available during the decision-making process and that, as a result, the project's true impacts cannot be ascertained without further environmental analysis."  DOI singled out FERC's development of baseline data for wildlife impacts; FERC's reliance on stale and inadequate information, including the Landfill EIS; and FERC's analysis of bighorn sheep migration.  FERC denied DOI's requests for a stay and rehearing.

**D.    Eagle Crest ROW and LUPA**

76.    In addition to reservoirs, water pump infrastructure, and electricity-generation facilities, the Pumped Storage Project requires a transmission line and a

water-supply pipeline to operate.  The transmission line is known as a generation-interconnection ("gen-tie line") because it would connect the Pumped Storage Project to the broader Southern California transmission network.  If constructed, the gen-tie line would consist of a series of towers supporting a sixteen-mile 500 kilovolt transmission line.  The water-supply pipeline would be used to source and refill the groundwater needed for operations.  The 15-mile-long pipeline would be 12-14 inches in diameter and buried underground.  Temporary three-foot-high fencing would be constructed around any access roads during construction.

77.   In late 2018, BLM granted Eagle Crest the ROW for the Pumped Storage Project.  A ROW is "an authorization to use a specific piece of a public land for a specific project for a specific period of time."  The ROW here authorizes a 16-mile, 200-foot-wide gen-tie line and a 15-mile, 60-foot-wide water-supply pipeline within its borders, which enclose approximately 1,150 acres of public lands.  Of the 1,150 acres, 507 acres are for the gen-tie line, 154 acres are for the water pipeline, and 489 acres are for "ancillary facilities."

78.   Presumably the ROW's duration matches the Pumped Storage Project's "minimum expected lifetime of 50 years, with an opportunity for a lifetime of an additional 50 years or more with equipment replacement and repowering."

79.   As discussed above, the ROW traverses extremely sensitive Sonoran Creosote Bush Scrub, Desert Dry Wash Woodland, and the Chuckwalla ACEC.  BLM's EA estimates that the gen-tie line alone will disturb 3.4 acres of Sonoran Creosote Bush Scrub and 1.6 acres of Desert Dry Wash Woodland.  EA 85.  Meanwhile, the entire ROW (including the gen-tie line, water supply pipeline, and associated access roads) is likely to disturb over 10 acres of desert tortoise habitat.

80.   Figure 1 (immediately below) illustrates the ROW's path (outlined in black) from the Pumped Storage Project (labeled "Central Project Area") to the water supply wells and the electric substation.  The diagonal blue lines are the Chuckwalla ACEC, which the gen-tie line and water-supply pipeline will cut directly through.

**Figure 1:**
Gen-Tie Line and Water Supply Pipeline Crossing into DRECP ACEC (EA 4)



81.  As Figure 2 below shows, the Pumped Storage Project's gen-tie line will occupy 507 acres of BLM-managed land, 369.6 acres of which fall outside designated utility corridors.  The water pipeline will occupy 81.4 acres of BLM-managed land, 59.3 acres of which fall outside designated utility corridors.

82.  Because the gen-tie line and water pipeline exceed the DRECP's parameters described above, and because the ROW route falls partially outside the DRECP's designated utility corridors, Eagle Crest sought, and BLM approved, a LUPA to the CDCA Plan.

83.  Figure 2 (immediately below) also shows that the gen-tie line and water-supply pipeline will bisect the habitat outside designated utility corridors.  This habitat fragmentation risks amplifying the adverse impacts described in Paragraphs 106-122 below.

**Figure 2:**
Portions of the Gen-Tie Line and Water Supply Pipeline
Outside DRECP-Designated Utility Corridors (EA 5)



## E.   2016 BLM ROW EA

### General Review

84.     Before approving the ROW and LUPA, BLM was required by NEPA, CEQ's NEPA regulations, and DOI's NEPA regulations to analyze and disclose potential environmental impacts.  BLM decided to prepare an abbreviated EA, rather than a more thorough EIS, presuming from the outset that the ROW and LUPA would have less-than-significant impacts.  BLM tiered its EA to the 2012 FERC EIS, including the EIS's evaluation of groundwater and biological-resource impacts.

85.     On April 20, 2017, BLM issued its EA and FONSI for the ROW and LUPA.  On August 20, 2018, BLM issued its Decision Record approving the ROW and LUPA.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

86.     The EA states that the purpose and need for the "project"—that is, the ROW and LUPA—is to "respond to [Eagle Crest's] application . . . for a ROW grant to construct, operate, maintain, and decommission a 500-kilovolt (kV) transmission line, water supply pipeline, and components of a pumped storage project on public lands" in compliance "FLPMA, BLM ROW regulations, and other applicable federal laws."  In its application, Eagle Crest stated that it needed the ROW to connect the Pumped Storage Project to the southern California utility system electrical grid.

87.     Many legal authorities guide BLM's land-use decisions, some of which are discussed in the Legal Background section above.  The EA, however, cites only those authorities that promote, or that BLM interprets to promote, energy transmission and renewable-energy development.  As discussed in Paragraph 59, the Pumped Storage Project is an energy-storage, not a renewable-energy, project. Regarding BLM's conservation obligations, the EA cites no legal authorities related to the requirement that BLM manage public lands under its jurisdiction "without permanent impairment of the productivity of the land and the quality of the environment," 43 U.S.C. § 1702(c), or to avoid undue degradation or impairment under FLPMA and the CDCA Plan, *id.* §§ 1732(b),1781(f).

88.     The EA analyzes the environmental impacts of one alternative: BLM's "preferred" alternative to issue the ROW and approve the LUPA.  The EA briefly describes a no action alternative but does not analyze that alternative's impacts or compare them to the "preferred" alternative's impacts.  Instead, in a single paragraph, the EA describes the possible uses for the land subject to the ROW and LUPA should BLM reject the "preferred" alternative.

89.     The EA does not consider any other "action" alternative in detail.  For example, the EA does not consider an alternative that would serve other federal management priorities for the area, such as one allowing reintegration of the lands subject to the ROW and LUPA into Joshua Tree National Park.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

90.     The EA rejects from detailed consideration other "action" alternatives that would grant the ROW and approve the LUPA, but with modifications.  For example, the EA fails to consider alternatives that would have limited the ROW to either the boundary of the Pumped Storage Project set out in the 2014 FERC license (which would have kept the gen-tie line and water supply pipeline within that boundary), or to the lands specified in Eagle Crest's original ROW application.  The EA rejects these alternatives from detailed consideration because, in BLM's view, they did not respond to Eagle Crest's need for flexibility to adjust the final footprint of structures that would be constructed in the ROW.

Groundwater Impacts

91.     To operate the Pumped Storage Project, Eagle Crest plans to fill and replenish the iron ore pits with groundwater pumped from the Chuckwalla Valley Aquifer.  Eagle Crest will initially require 32,000 acre-feet of water to fill the reservoirs, but annual evaporative losses of approximately 1,700 acre-feet per year, plus water required for construction, raise the Pumped Storage Project's total estimated water usage to 109,620 acre-feet, or 35 billion gallons, over the Project's 50-year lifetime.  The water-supply pipeline will transport this water from the private wells to the Pumped Storage Project's lower reservoir.

92.     The Chuckwalla Valley Aquifer is an ancient, 45-mile wide, naturally occurring underground groundwater basin.  The Aquifer is hydrologically connected to the Orocopia, Pinto, Palo Verde Mesa, and Palo Verde groundwater basins, as well as to the Colorado River.  The majority of water in the Chuckwalla Valley Aquifer is believed to have slowly accumulated over the past million years.  Limited natural recharge, including precipitation and flow from other water basins, supplements the Aquifer's ancient reserves.  Changes in groundwater levels are a function of water inflows (natural recharge) and water outflows (natural seepage and human uses).

93.     Overdrawing groundwater from the Chuckwalla Valley Aquifer—that is, causing outflows to exceed inflows—poses significant risks.  They include land

subsidence, reduced flow to local springs, and reduced flow to the Colorado River, which is itself in a state of overdraft.  The first, subsidence, is "the downward settling of the land surface caused by a lowering of the water table (such as by extensive water withdrawal) or an increase in the water table that causes the consolidation and settling of the soils."  According to the 2012 FERC EIS, "[s]ubsidence could potentially occur as a result of project pumping if drawdown levels are substantial, typically greater than historical levels, causing the subsurface stratum to collapse."  Second, the Chuckwalla Valley Aquifer is not thought to be hydrologically connected to local springs in the Eagle Mountain area.  Nonetheless, there are serious concerns that groundwater pumping from the Aquifer may affect other local springs.  Finally, reduced flow to nearby basins that flow into the Colorado River may also reduce the water that is ultimately available for the Colorado River.

94.     To evaluate the impacts of removing 109,620 acre-feet (35 billion gallons) of water from the Chuckwalla Valley Aquifer, BLM's EA tiers to the 2012 FERC EIS.  That document relied heavily on a simple "analytical" groundwater model that subtracted the estimated water used (outflows) from the estimated water recharge (inflows).  Where outflows exceed inflows for a given period, the Chuckwalla Valley Aquifer is forecasted to be in overdraft.  Using this model, the 2012 FERC EIS concluded that pumping would create overdraft conditions in the short term, but that the Aquifer's natural recharge (which FERC estimated to be about 12,700 acre-feet per year) would be sufficient over the long-term to replenish the water extracted for the Pumped Storage Project over the Project's 50-year lifetime.  Notably, FERC's conclusion excluded the effects of other reasonably foreseeable proposed projects that would draw on the same groundwater reserves.  When those projects were factored in, the Chuckwalla Valley Aquifer would likely experience a net water loss over the Project's 50-year lifetime.

95.     As discussed in Paragraphs 70-73 above, multiple agencies critiqued the 2012 FERC EIS, including EPA, the National Park Service, and BLM itself.  Many

of those critiques concerned the EIS's groundwater-impacts analysis.

96.    EPA criticized the 2012 FERC EIS's lack of adequate analysis of mitigation measures should groundwater drawdown "impact neighboring wells, lower the water table, or adversely affect groundwater-dependent vegetation and woodlands."

97.    The National Park Service warned that the 2012 FERC EIS both overestimated groundwater recharge and underestimated groundwater usage.  In the Park Service's view, the 2012 FERC EIS's groundwater recharge assumptions were unfounded, as they were over four times as large as the Park Service's estimates (12,700 versus 3,000 acre-feet per year).  The 2012 FERC EIS acknowledged that the Pumped Storage Project would create a temporary period of overdraft during its initial fill period.  The Park Service, however, warned that the Chuckwalla Valley Aquifer likely had already been in overdraft for several decades.

98.    Meanwhile, BLM criticized the 2012 FERC EIS for failing to consider the Pumped Storage Project's impacts on the Colorado River, as well as the heightened risk of groundwater overdraft conditions given other industrial uses of groundwater from the Chuckwalla Valley Aquifer.  BLM also observed that "there has been and continues to be considerable debate between agency staff, the proponent and various stakeholder groups regarding the 'correct number' to assign to groundwater recharge for the basin."

99.    Based on these and other concerns, BLM worked with national labs to develop and publish three updated groundwater studies for the Chuckwalla Basin to assess the impact of withdrawing groundwater for transport by the water pipeline. The first updated study, published in 2012 with Lawrence Berkeley National Lab and Godfrey, et al., acknowledged the significant "academic disagreement" about the Chuckwalla Valley Aquifer's recharge rate.  Nonetheless, it concluded that FERC's recharge estimate of 12,700 acre-feet per year fell considerably outside of the range of reasonable estimates of 3,000 to 8,000 acre-feet per year.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

100.   The second and third groundwater recharge studies, published in 2013 with Argonne National Laboratory and in 2017 with Lawrence Berkeley National Lab, employed a more sophisticated "numerical" groundwater modeling system. Numerical models of groundwater recharge are more dynamic models that use the rates of change of various hydrologic parameters (including overland and subsurface flow, among others) to calculate groundwater recharge rates.  These models estimated recharge rates of 3,000 to 6,000 (Godfrey 2012) and 7,100 to 11,500 (Shen 2017) acre-feet per year—meaning that FERC's estimate exceeded even the most optimistic recharge rate.  These models concluded that pumping by the Pumped Storage Project would exceed the Chuckwalla Valley Aquifer's natural recharge for at least the first 20 years of the Project's operation.  IBLA Appeal 19-21.

101.   In 2016, BLM approved the DRECP, which amended the CDCA Plan. The DRECP, which BLM co-authored, included a requirement called "LUPA SW-23" that groundwater supply assessments use more in-depth "numerical" models, rather than simple "analytical" models.

102.   Despite this history—the critiques of the 2012 FERC EIC's groundwater modeling (including by BLM itself), the development of more sophisticated groundwater modeling demonstrating graver recharge results (again, by BLM itself), and the DRECP's requirement to rely on numerical modeling—BLM relied almost wholesale on the 2012 FERC EIS, including its simply analytical groundwater modeling, in the EA for the ROW and LUPA.  Indeed, in the EA BLM did not rely on or even cite any of the updated groundwater models, even though they all showed the Pumped Storage Project would push the Chuckwalla Valley Aquifer into overdraft, and even though BLM had itself worked to generate them to address its own and other agencies' concerns with the modeling in the 2012 FERC EIS.

103.   The EA offers no explanation for why it could rely on the 2012 FERC EIS's simple groundwater model when the DRECP required a more sophisticated "numerical" model.  The EA states only that a "groundwater supply assessment was

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

prepared in an extensive technical review of the [Pumped Storage Project's] potential impacts on groundwater level and quality," and that the assessment was well-documented, subject to technical review, and critiqued by state and federal agencies.

104.   In its responses to comments, BLM cited a 2013 Environmental Impact Report by the California State Water Resources Control Board, which also relied on analytical, rather than numerical, modeling.  The State Water Board's final Environmental Impact Report did not take account of the 2012 Godfrey report, which showed a recharge rate of just 3,000 to 6,000 acre-feet per year.  (The 2012 Godfrey Report was published after the close of the public comment period on the Board's draft Environmental Impact Report.).  After NPCA sought reconsideration of the State Water Board's analysis (including on the basis of the 2012 Godfrey Report), FERC determined that the Pumped Storage Project was a "closed loop" system and therefore that the State Water Board lacked jurisdiction to require a permit for the Project's water use.  As a result, the State Water Board terminated its environmental review without considering the 2012 Godfrey Report.  In short, BLM relied in its EA on a state agency analysis that was both outdated and incomplete.

105.   Finally, in the EA, BLM purportedly addressed the cumulative impacts of groundwater withdrawals from the Chuckwalla Valley Aquifer.  Three aspects of BLM's analysis stand out.  First, BLM deducted from its analysis ten proposed solar projects that were canceled after the 2012 FERC EIS.  Second, BLM eliminated as a water use the Eagle Mountain Landfill, which was canceled in 2014.  Third, BLM updated the schedule for the Pumped Storage Project to reflect delays in its construction schedule.  Together, BLM used these factors to reduce the cumulative water demand across all reasonably foreseeable projects by 114,560 acre-feet.  Curiously, this amount matched almost exactly the 109,620 acre-feet the Pumped Storage Project was projected to use over its lifetime.  EA 19.  Yet BLM did not account for projects that had been proposed, and thus were reasonably foreseeable, *after* FERC published its 2012 EIS.  *See infra* ¶¶ 125-26.  Nor did BLM address

National Park Service estimates that the Chuckwalla Valley is already in a state of overdraft, with annual recharge of 3,300 to 6,000 acre-feet per year compared to withdrawals of 10,579 acre-feet per year. *See* https://planning.rctlma.org/sites/g/files/aldnop416/files/migrated/Portals-14-Postings-Athos-FinalEIR-AppendixG.pdf.

Biological Impacts

106.   By disturbing the Sonoran Creosote Bush Scrub and Desert Dry Wash Woodland habitats, the ROW and LUPA will adversely affect the threatened desert tortoise and bighorn sheep that live in those habitats in and near the ROW area.

107.   The area surrounding the ROW is also important threatened habitat for the Bendire's and LeConte's thrashers, which are listed under the Migratory Bird Treaty Act.

108.   Recognized as California's state reptile, the desert tortoise is famous for burrowing to escape extreme desert temperatures.  Although these iconic creatures were once pervasive throughout the desert, human development has erased tortoise habitat and attracted tortoise predators, including ravens, to more and more areas. The resulting population declines prompted the U.S. Fish and Wildlife Service to list the desert tortoise as "threatened" in 1990.

109.   Desert tortoises do not migrate far, sticking to home ranges of 2.5 to 100 acres, which they get to know extremely well over the course of decades.  Tortoises mate in areas where their individual ranges overlap, and uninterrupted corridors of overlapping habitat support tortoise genetic diversity.  This genetic diversity is crucial for the long-term health of tortoise populations, especially to the extent that more northern populations acquire the genes of southern tortoises, which are more adapted to warmer temperatures, as the desert warms.

110.   The area east of the Pumped Storage Project (known as the "Chemehuevi to Chuckwalla Linkage Zone") is one of the most critical habitats for desert tortoise habitat connectivity.  Already the degree of ground disturbance level

in this area is above the level the DRECP permits.  The gen-tie line and water pipeline authorized as part of the ROW and LUPA will cause more ground disturbance and are authorized to cut directly across the Chemehuevi to Chuckwalla Linkage Zone.

111.   The ROW presents multiple threats to desert tortoises, including habitat loss, habitat connectivity loss, construction threats (death, injury, crushing of burrows), and increased predation by ravens (by creating more perching locations like poles and fences).  As discussed above, separating tortoise populations reduces genetic diversity and further exposes tortoise populations to climate change and other risks.  Even temporary loss of habitat can be devastating for the tortoise population, as it can take decades for the habitat to return to pre-construction conditions.  As the U.S. Fish and Wildlife Service puts it, all ground-disturbing impacts in the Project area are "effectively permanent."  As discussed in Paragraph 79 above, the EA estimates that the construction of the gen-tie line, water supply pipeline, and associated access roads will disturb over 10 acres of desert tortoise habitat.  In addition to temporary habitat loss, construction risks causing direct injury or death from crushing, trampling, or burial.  The support structures for the gen-tie line would likely provide additional nesting and perching locations for tortoise predators, including ravens.

112.   The EA relies on a Biological Opinion that the U.S. Fish and Wildlife Service issued to FERC in 2012.  The Biological Opinion expresses particular concern for tortoise habitat connectivity, explaining that the Pumped Storage Project and ROW would increase traffic on Kaiser Road, which runs parallel to the ROW for much of its length.  Moreover, "when added to baseline levels of traffic from other projects and human activity in the area, the additive increase in mortality and associated decrease in the tortoise population in the habitat linkage is likely to adversely affect population connectivity."

113.   In 2016, BLM re-surveyed the land immediately around the ROW. Based on that survey, BLM concluded in the EA that the harm to desert tortoises was on the same order of magnitude as the harm measured in 2012.  Notably, even in a drought year with low tortoise numbers, BLM's survey continued to find evidence of tortoise activity along the ROW.  BLM published the EA before finalizing consultation with the U.S. Fish and Wildlife Service.

114.   Since the ground disturbance in the Chemehuevi to Chuckwalla Linkage Zone exceeds the limit required by the DRECP, Eagle Crest ordinarily would have been required to directly mitigate the disturbance of 14 acres in the Chemehuevi to Chuckwalla Linkage Zone.  However, the EA allows Eagle Crest to mitigate elsewhere, including in a less-valuable habitat area, if Eagle Crest concludes that "no suitable mitigation opportunities exist within the Chemehuevi to Chuckwalla Linkage Zone."

115.   Desert tortoises are not the only imperiled creature that BLM's ROW and LUPA will adversely affect.  Just as tortoises burrow to stay cool, bighorn sheep combat extreme desert temperatures by migrating between the canyons and rocky areas on the desert floor in the winter and the cooler mountains in the summer. Desert bighorn sheep are not listed under the federal Endangered Species Act, but they are a fully protected species under the California Fish & Game Code and a BLM-designated "California Sensitive Species."  The 2012 FERC EIS identifies bighorn sheep as one of the species most at risk of experiencing "concentrated project effects."

116.   Like the desert tortoise, bighorn sheep (both individuals and populations) face growing threats from development.  The movement of sheep between populations is critical for genetic diversity; barriers between populations "reduce gene flow and could reduce fitness for [isolated] populations."  As the NPS Boundary Study explains, "[h]abitat fragmentation has resulted in loss of genetic diversity (Epps et al. 2005) as well as reductions in fitness and vigor making bighorn

sheep more vulnerable to stressors such as disease, drought, and predation."

117.   The Pumped Storage Project would be located within a major migration corridor between the Eagle and Coxcomb mountains.  According to the NPS Boundary Study, this corridor is "critically important for maintaining connectivity among desert bighorn sheep herds."  The Coxcomb and Eagle Mountain herds are the two most important for maintaining "meta-population connectivity."  Accordingly, "[i]mpacts from the Eagle Mountain Pumped Storage Hydroelectric Project, even with the additional land protection in [BLM's chosen alternative], could have substantial, long-term and adverse impacts because the project site intersects the biological movement corridor for bighorn sheep."

118.   The Pumped Storage Project would also be located in the Joshua Tree National Park Desert Bighorn Sheep Wildlife Habitat Management Area.  This special-management area was an amendment to the CDCA Plan to protect vulnerable habitat for bighorn sheep.

119.   In its EA, BLM relied on studies suggesting that the old mining pits that the Pumped Storage Project would convert into reservoirs impeded genetic connectivity.  However, the Park Service has explained that, "[a]lthough some portions of the study area have been developed and altered to support the area's former mining operations, . . . some natural recovery of the area has begun in areas that were previously mined.  Landscape-scale conservation approaches that include opportunities to protect regional wildlife corridors will be an important component in addressing threats to park biodiversity."

120.   Despite recognizing the importance of maintaining bighorn sheep genetic diversity and the growing risks to it, the EA adopts FERC's conclusion that "construction activities would not cause a migratory barrier."  In preparing the EA, BLM did not perform any further review of bighorn sheep migration around the ROW, and the EA does not respond to BLM's own comment on the 2012 FERC EIS that "the analysis of project impacts on sheep populations is inadequate."

121.   The National Park Service critiqued the EA's analysis of the ROW's biological impacts, explaining that BLM needed to prepare an EIS instead of an EA due to the likely severity of impacts.  The Park Service expressed particular concern about the EA's failure to analyze the impacts of the ROW and LUPA on wildlife, including the desert tortoise and bighorn sheep.  The Park Service noted that the EA did not rely on current, site-specific baseline data for wildlife surveys for all species in the ROW area.

122.   The NPS Boundary Study encourages moving the Pumped Storage Project and ROW area into permanent conservation: "Iconic species such as bighorn sheep and desert tortoise would benefit directly from the protection of this area and their populations could flourish in the long-term.  With the ability to travel, bighorn sheep and desert tortoise would have greater genetic diversity; as such, the likelihood of local extinctions would be greatly reduced.  Wildlife populations would be healthy and self-sustaining, and ecological connectivity would be restored on a large scale."

Cumulative Impacts

123.   NEPA, CEQ's NEPA regulations, and DOI's NEPA regulations required BLM to analyze the cumulative impacts of the ROW and LUPA together with past, present, and reasonably foreseeable future actions, whether public or private.

124.   The EA defines the Cumulative Effects Study Area ("CESA") for *water resources* as the Chuckwalla Valley Aquifer plus hydrologically connected adjacent aquifers, such as the Pinto Basin Aquifer.  The EA defines the CESA for *terrestrial resources* as the lands above the Chuckwalla Valley Aquifer and Pinto Basin Aquifer, including portions of Joshua Tree National Park.  The CESA for *other resources*, including geological resources and soils, terrestrial and threatened and endangered species, cultural resources, socioeconomics, air quality, and noise, includes the portion of the Chuckwalla Valley and I-10 corridor that encompasses the Pumped Storage Project and the ROW.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

125.   Commenters identified six large-scale solar projects within the CESA that were pending at the time BLM prepared its EA: Jupiter (now known as Victory Pass), Io Solar, SunPower, Arica, Desert Quartzite, and Crimson Solar.  Each of these projects was adjacent to at least one of the projects that BLM included in its list of reasonably foreseeable projects.  However, as discussed in Paragraph 105, BLM did not include these projects in its list of reasonably foreseeable projects as part of the EA's cumulative impacts analysis, including its cumulative groundwater impacts analysis.  Protest Report/2-9/21.  According to BLM, "Jupiter, Io Solar, SunPower, Arica, and Desert Quartzite are in the very early stages, with no perfected applications or Plans of Development.  The BLM has not yet released a Notice of Intent for Crimson Solar.  The water sources and usage of these projects are therefore unknown . . . ."

126.   In addition, since BLM released the EA, several new projects have been proposed and are either in the approval pipeline, under construction, or, as in the case of the 457-megawatt Palen Solar Project, already in service.  Such projects not considered in the EA include the above-mentioned Arica, Victory Pass, Desert Quartzsite, and Crimson projects, but also new projects including Athos Solar, Blythe Mesa and Palo Verde Mesa, Easley Solar (with a proposed 650-megawatt hydrogen storage component), Oberon Solar, Palen Solar, which became fully operational in October 2022, and, most recently, the proposed Sapphire Solar project. Palen Solar alone consumed 750 acre-feet of groundwater during construction, with similar amounts likely to be used as other projects are built.  The likely cumulative effects on groundwater supplies flowing from these and other projects are discussed below in Paragraph 165.

127.   The only reasonably foreseeable project that the EA adds to its cumulative impacts analysis is the potential expansion of Joshua Tree National Park. This selective analysis allowed BLM to count the potential expansion's positive environmental benefits (such as increased habitat connectivity), without having to

count the adverse environmental effects of other, equally foreseeable development projects.  Moreover, the EA does not address how the environmental benefits associated with the potential expansion of Joshua Tree National Park would be offset by the construction of the Pumped Storage Project and ROW facilities.

**F.     Post-EA Procedural History**

128.   In 2015, BLM published a "Notice of Intent to Amend the Resource Management Plan for the California Desert Conservation Area and Prepare an Environmental Assessment for the Plan Amendment and Eagle Crest Pumped Storage Project."  EA 9.  BLM received over 2,000 comments on this Notice.

129.   In 2016, BLM issued a draft EA.  In November 2016, NPCA filed comments on the draft EA, arguing that the EA impermissibly tiered to the stale data and analysis in the 2012 FERC EIS, failed to take a hard look at the impacts of the ROW and LUPA to groundwater and biological resources, failed to adequately analyze alternatives to the ROW and LUPA, failed to adequately analyze the cumulative impacts of the ROW and LUPA, and ignored the ROW and LUPA's significant impacts, which required an EIS.  NPCA, joined by NPS in its own comments, specifically indicated that there was substantial controversy over groundwater impacts such that an EIS was required.  In April 2017, BLM issued its responses to comments.

130.   In June 2017, NPCA filed a protest of the proposed ROW and LUPA. In its protest, NPCA argued that the EA was legally flawed because it employed an outdated purpose and need statement, failed to consider a reasonable range of alternatives, and failed to consider new information and changed circumstances related to groundwater impacts.  NPCA argued that a full EIS was required and that the LUPA was inconsistent with FLPMA and the DRECP.

131.   In August 2018, BLM responded to and rejected NPCA's and other protests.  BLM then issued its Decision Record approving the ROW and LUPA.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

132.   On August 30, 2018, NPCA and three other groups (the Coalition to Protect America's National Parks, Defenders of Wildlife, and the Sierra Club ("NPCA, et al.")) timely appealed and petitioned for a stay of BLM's Decision Record to the Interior Board of Land Appeals ("IBLA").  *See generally National Parks Conservation Association, et al.*, IBLA No. 2018-093.  On October 5, 2018, the IBLA denied NPCA's stay petition.  The IBLA reasoned that, "because the appellants have not supported their claims that construction on the ROW is imminent, they have not shown a likelihood of immediate harm as a result of BLM's decision record."

133.   Apart from denying the stay petition in 2018, the IBLA has not taken further action in NPCA, et al.'s, administrative appeal.  *See* IBLA Pending Appeals, https://www.doi.gov/oha/organization/ibla/IBLA-Pending-Appeals (listing status of No. 2018-093 as "Awaiting Action" as of August 31, 2023).

134.   Because the IBLA denied the stay petition filed by NPCA, et al., and therefore failed to make BLM's Decision Record and the ROW inoperative pending appeal, NPCA may now seek judicial review of BLM's Decision Record, environmental review, and the ROW.  *Darby v. Cisneros*, 509 U.S. 137, 154 (1993) ("[W]here the APA applies, an appeal to 'superior agency authority' is a prerequisite to judicial review *only* when expressly required by statute or when an agency rule requires appeal before review and the administrative action is made inoperative pending that review."); *NPCA v. BLM*, 606 F.3d 1058, 1064 (9th Cir. 2010) (where an "Appeals Board fails to act upon a petition for stay or denies such a petition, the decision becomes effective immediately"); *Desert Citizens Against Air Pollution v. Bisson*, 231 F.3d 1172 (9th Cir. 2000) (reviewing BLM's record of decision as the final agency action where the IBLA had denied a stay petition).

135.   To avoid any concern that NPCA, et al.'s, IBLA appeal presents the risk of independent, conflicting agency decisions in this matter, on September 8, 2023 (the date of this complaint), NPCA, et al., filed a motion to voluntarily dismiss their

IBLA appeal.  *See NPCA*, 606 F.3d at 1064 n.2; *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 255 F. Supp. 2d 1030, 1036-38 (D. Ariz. 2003); *but see Farrell-Cooper Mining Co. v. U.S. Dep't of Interior*, 864 F.3d 1105, 1117-18 (10th Cir. 2017) (explaining that IBLA and judicial challenges may proceed simultaneously).

136.   On November 22, 2021, Eagle Crest applied to BLM to amend its ROW and, on October 12, 2022, to FERC to amend its Federal Power Act license.  Both applications cite a need to relocate the Pumped Storage Project's gen-tie line to join the Red Bluff substation from the east, rather than from the north, and to remove the substation from the Pumped Storage Project boundary, all to accommodate neighboring large-scale solar projects.  The proposed changes would increase the gen-tie line's length by 1.2 miles and increase the ROW area by 75 acres.  Much of the additional disturbed acreage includes Desert Dry Wash Woodland habitat.

137.   Eagle Crest's amendment applications remain pending.  BLM has indicated that it will process the ROW amendment application after FERC processes the license amendment application.

138.   The Pumped Storage Project, as currently configured, cannot proceed without approval by FERC and BLM of Eagle Crest's applications to amend the license and ROW.

139.   On February 15, 2023, Eagle Crest filed a request to stay the commencement- and completion-of-construction deadlines in its Federal Power Act license.  Eagle Crest filed this request after exhausting the four two-year extensions authorized under the Federal Power Act.  On June 15, 2023, FERC granted the request, over NPCA's protest.

140.   Eagle Crest predicated its stay request in large part on the "ongoing impediment to efforts to develop the Project" flowing from an "appeal" by the Desert Protection Society of the ROW and LUPA.  Eagle Crest wrote: "When the IBLA denied the request for a stay on November 26, 2018, these project opponents sought review in federal district court by submitting a Complaint for Declaratory and

Injunctive Relief on January 31, 2019, leaving certain project opponents' [NPCA's] appeal still before the IBLA."

141.   This statement in Eagle Crest's February 15, 2023, stay request was the first time NPCA and its counsel became aware of the case filed by the Desert Protection Society ("DPS") against Defendants in the Eastern District of California. That case is *Desert Protection Society v. Bernhardt, et al.*, No. 2:19-cv-00198-DJC-CKD.  The parties have filed cross-motions for summary judgment, which, on August 25, 2022, the court took under submission without oral argument.  On April 4, 2023, the case was reassigned from District Judge Troy Nunley to District Judge Daniel Calabretta.  The case remains pending.

142.   The plaintiff in *Desert Protection Society v. Bernhardt, et al.* raises and prosecutes claims under NEPA and FLPMA, but on grounds that materially differ from those asserted in this complaint.

## FIRST CAUSE OF ACTION
### (Violations of NEPA)

143.   Plaintiffs reallege and incorporate by reference each and every allegation set forth above.

144.   Defendants violated NEPA.  Specifically, in preparing the EA for the ROW and LUPA, they: (1) impermissibly tiered to the inadequate and outdated 2012 FERC EIS; (2) adopted an impermissibly narrow project purpose and need that resulted in an unreasonable range of alternatives; (3) failed to take a hard look at the direct and cumulative impacts of the ROW and LUPA; (4) were required but failed to prepare an EIS; and (5) were required but failed to prepare a supplemental EIS.  For the reasons set forth below, BLM's EA and Decision Record for the ROW and LUPA are arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with law and are subject to judicial review under the APA, 5 U.S.C. § 706(2).

## A. Impermissible Tiering

145.   When tiering to a prior NEPA analysis, an EA must "include a finding that the conditions and environmental effects described in the broader NEPA document are still valid or address any exceptions."  43 C.F.R. § 46.140.  Where a prior analysis is inadequate to support future decisions, the EA must correct the gaps and provide the necessary analysis.  43 C.F.R. § 46.140(b).  An EA must also consider whether there are any new circumstances or information that may significantly change the earlier analysis's environmental effects.  43 C.F.R. § 46.120.

146.   The EA violates NEPA by tiering to the 2012 FERC EIS, which was inadequate at the time it was prepared and outdated by the time BLM prepared its EA, particularly with respect to the groundwater impacts associated with the ROW and LUPA and associated Pumped Storage Project.

147.   The EA violates NEPA by tiering to FERC's prior analysis of biological resource impacts, which was outdated, incomplete, and preceded reinitiation of consultation with the U.S. Fish and Wildlife Service.  Indeed, the EA includes only a partial supplemental review conducted in 2016, reached its determinations without concluding the consultation process with the U.S. Fish and Wildlife Service, and does not provide any additional studies of bighorn sheep impacts beyond what was included in the 2012 FERC EIS, even though BLM critiqued the 2012 FERC EIS bighorn sheep analysis for being "inadequate."

148.   Because the EA fails to ensure that the analysis in the 2012 FERC EIS was legally adequate, and because the EA fails to address critical new information that had become available since that EIS's publication, the EA violates NEPA.

## B. Unlawful Purpose and Need; Unreasonable Range of Alternatives

149.   An agency may not foreground an applicant's purpose in drafting its own purpose and need statement.  Instead, the agency must independently evaluate the purpose and need for a project.  The agency's purpose and need statement must be sufficiently broad to allow an agency to consider a reasonable range of

alternatives.  42 U.S.C. § 4332(C)(iii); 43 C.F.R. §§ 46.310, .415(b).  Before it rejects an alternative from detailed consideration, an agency must explain its reasons for rejecting an alternative.  40 C.F.R. § 1502.14(a).

150.   The narrow purpose and need statement in the EA violates NEPA.  It is framed principally around the need to respond to Eagle Crest's application for the ROW.  The purpose and need statement also focuses only on legal authorities that prioritize energy transmission and renewable energy development, to the exclusion of other, superseding authorities that require BLM to serve other purposes, including conservation and environmental protection.

151.   By narrowing its purpose and need statement in these ways, the EA impermissibly adopts Eagle Crest's need for the ROW and fails to independently evaluate the need for the ROW in the context of countervailing considerations, including other public land management priorities.  Without an independent evaluation of the purpose and need for the ROW, the EA preordained approval of Eagle Crest's preferred ROW and impermissibly prioritized applicant's interests to the exclusion of conservation interests in the lands covered by the ROW.

152.   As a result of the EA's impermissibly narrow purpose and need statement, the EA fails to consider a reasonable range of alternatives.  The EA fully evaluates the environmental impacts of only BLM's preferred alternative, which was to grant Eagle Crest's requested ROW and approve the LUPA.  The EA also fails to adequately evaluate and consider the no action alternative.

153.   The EA failed to consider, but should have considered, an alternative that would have prioritized other public land management priorities, such as reintegrating the lands containing subject to the ROW into Joshua Tree National Park.

**C.    Failure to Take a Hard Look at Direct and Cumulative Impacts**

154.   NEPA's "hard look" standard requires BLM to analyze all reasonably foreseeable environmental impacts of the ROW in enough detail to support reasoned

conclusions about the proposed action and its alternatives.  40 C.F.R. §§ 1508.8, .9; BLM Handbook at 55.  This analysis must be "more than perfunctory," and it must uphold "scientific integrity," including by explaining its rationale for a choice of analysis where there is "substantial dispute" over the methodology or data.  40 C.F.R. § 1502.24; BLM Handbook at 55.  This "hard look" standard applies to direct, indirect, and reasonably foreseeable cumulative impacts of the action when added to other current and reasonably foreseeable future actions.  43 C.F.R. § 46.30.

155.   The ROW authorizes construction of a water supply pipeline that will allow Eagle Crest to extract and transport groundwater from the Chuckwalla Valley Aquifer to, and for use by, the Pumped Storage Project.

156.   To assess the impact of these groundwater withdrawals, the DRECP requires BLM to use sophisticated numerical modeling.  BLM and other agencies critiqued FERC for using simple analytical modeling as part of the 2012 FERC EIS. Subsequent to the 2012 FERC EIS, BLM helped to develop more sophisticated modeling that undermined the groundwater-related analysis and conclusions in the 2012 FERC EIS.

157.   Nonetheless, the EA relies exclusively on the 2012 FERC EIS's groundwater modeling, makes only minor adjustments that uniformly reduce forecasted water extraction, and ignores developments that increase (or would increase) forecasted water extraction, as well as modeling advancements that predicted reduced water recharge.  As a result, the EA paints a misleading picture of the groundwater impacts associated with the ROW and LUPA.

158.   The EA's analyses of adverse impacts to threatened species like the desert tortoise and bighorn is equally inadequate.  Those analyses do not meaningfully evaluate evidence of habitat loss, habitat fragmentation, decreased genetic diversity, and increased predation, and therefore discount the significance of those impacts.  Moreover, the EA does not contain sufficient baseline data on desert tortoise, bighorn sheep, and other biological resources in the area to adequately

1  analyze the effects of the ROW and LUPA.

2  159.   The EA unreasonably limits the scope of its cumulative effects study

3  area and excludes the adverse impacts of at least six reasonably foreseeable solar

4  projects.  Among other things, these projects will increase groundwater withdrawals

5  from the Chuckwalla Valley Aquifer.

6  **D.    Failure to Prepare an EIS**

7  160.   NEPA requires an agency to prepare an EIS for any major federal action

8  with the potential to significantly affect the environment.  42 U.S.C. § 4332(C); 43

9  C.F.R. § 46.400.  A proposed action's impacts are significant where the effects of an

10  action on the human environment are likely to be highly controversial, uncertain, or

11  likely to involve unique or unknown risks.  40 C.F.R. § 1508.27(b)(4)-(5).

12  161.   BLM violated NEPA by failing to prepare an EIS, for at least three

13  reasons.  First, the water supply pipeline authorized by the ROW and LUPA will

14  facilitate overdraft of the Chuckwalla Valley Aquifer, which will create significant

15  risks to the Aquifer and surrounding environment.  There is no dispute that the initial

16  fill of 32,000 acre-feet of water for the Pumped Storage Project's water reservoirs

17  will cause overdraft in the Chuckwalla Valley Aquifer, and substantial evidence in

18  the record suggests that the Pumped Storage Project's operation will lead to long-

19  term overdraft conditions.  Overdraft conditions create risks of land subsidence,

20  reduced flow to local springs, and reduced flow to the Colorado River, all of which

21  have potentially significant cascading environmental consequences.  These impacts

22  associated with the ROW are significant and must be evaluated in an EIS.

23  162.   Second, there is a high level of controversy in the scientific community

24  regarding the recharge rate of the Chuckwalla Valley Aquifer.  More recent and

25  sophisticated models of the Aquifer's annual recharge—which BLM failed to take

26  account of—estimate the recharge rate to be just 3,000 acre-feet per year, much lower

27  than the 12,700 acre-feet per year estimate on which the EA relies.  With an

28  estimated use of 109,620 acre-feet of water over the Pumped Storage Project's 50-

year lifespan, the ROW will facilitate overdraft of the Chuckwalla Valley Aquifer at a much faster rate and impede its capacity to recharge.

163.   Finally, the effects of the ROW and LUPA on groundwater and biological resources are highly uncertain and therefore significant.  The EA does not contain sufficient baseline data on desert tortoise, bighorn sheep, and other biological resources in the area to adequately analyze the effects of the ROW and LUPA.

164.   These numerous significant effects require the preparation of an EIS. By failing to prepare one, BLM has violated NEPA.

**E.    Failure to Prepare a Supplemental EIS**

165.   An agency must supplement its environmental review where, among other things, there are "significant new circumstances or information" affecting a project's environmental impacts and "a major Federal action remains to occur."  40 CFR § 1502.9(d) (current).

166.   BLM's existing environmental review is the EA for the 2018 Decision Record.

167.   On November 22, 2021, Eagle Crest applied to amend the ROW, which requires BLM's approval.  BLM has not yet acted on the amendment.  Therefore, "a major Federal action remains to occur."

168.   Since 2018, when BLM issued the ROW, significant new information has come to light that may change the EA's analysis of the impacts of the ROW and LUPA.  Among other things, eight new solar projects have been proposed, approved, or built in the vicinity of the proposed Pumped Storage Project, namely the Oberon, Palo Verde Mesa, Crimson,  Athos, Easley, Victory Pass, and Arica solar projects. Together, these projects would cover approximately 27,000 acres of land in the Chuckwalla Valley.  Using the extremely conservative  calculations for water use per acre for photovoltaic solar plants suggested by Frisvold, et al. (2014), these proposed projects would increase groundwater use by at least 5,400 acre-feet per year—nearly twice the most current estimates of recharge.  In addition to water use for normal

solar operations, the proposed Easley solar power plant includes a hydrogen storage component, in which the hydrogen would be created by electrolysis of local water supplies. In addition to the water that would be split to recover hydrogen, electrolytic production requires significant amounts of water for cooling, deionizing feedstock water, and other industrial functions. Further, a 2021 study by the University of California, Berkeley, found that most species of desert birds are in sharp decline across the Mojave and Colorado deserts. The construction of transmission lines, which provide perching opportunities for predatory ravens, across generally bird-rich habitat such as desert dry wash woodland could provide perches for ravens and other predators of smaller birds. Perches provide additional advantage in hunting, only increasing the pressure on small bird species.

169. In addition, since (and before) the time that BLM granted the ROW, Eagle Crest has been unable to secure a power-purchase agreement for the Pumped Storage Project. California's energy regulatory proceedings—which determine how much of which energy resource is needed, by when and where, and in a manner that protects ratepayers from unnecessary costs—have consistently resulted in market conditions and procurement targets that show the Project is not needed to meet California's aggressive climate goals. The California Legislature continues to prioritize other long-duration storage energy projects, and a number of modestly sized and priced long-duration energy-storage projects have secured buyers and obtained regulators' backing. These developments bring into question the fundamental purpose and need for the ROW.

170. In light of this pending approval and new information, which information suggests that the impacts of the amended ROW may be significant, BLM is obligated to prepare a supplemental EIS or EA. To the extent that BLM has acted on Eagle Crest's ROW amendment application and prepared an environmental review other than an EIS or EA, BLM has violated NEPA.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

## SECOND CAUSE OF ACTION

### (Violations of FLPMA and the CDCA Plan)

171.   Plaintiffs reallege and incorporate by reference each and every allegation set forth above.

172.   FLPMA requires BLM to manage the public lands within its jurisdiction, including the lands subject to the ROW and LUPA, to prevent "unnecessary or undue degradation."  43 U.S.C. § 1732(b).  In addition, the portions of the ROW that traverse ACECs are given "special protection" to prevent irreparable damage.  *Id.* §§ 1701(a)(11), 1702(a).  In addition, as part of the CDCA, the entire ROW area is protected against "undue impairment."  *Id.* § 1781(b).  "Undue impairment" imposes a higher standard of care than "undue degradation"—meaning that *less* harm is required to establish a violation.

173.   The ROW and LUPA will enable Eagle Crest to permanently withdraw 35 billion gallons of water from the Chuckwalla Basin.  This unprecedented withdrawal of water will create overdraft conditions in the short- and long-term, especially when considered alongside other reasonably foreseeable renewable-energy projects in the area.  Enabling overdraft conditions in the California desert, particularly without sufficient analysis of the impacts of doing so, constitutes undue degradation and undue impairment.

174.   The ROW slices through two types of highly sensitive habitat, Sonoran Creosote Bush Scrub and Desert Dry Wash Woodland.  These habitats may take decades to recover from construction of the gen-tie line and water pipeline authorized as part of the ROW and LUPA.  As part of the CDCA, the habitats underlying the entire ROW, and especially those portions in ACECs, require and have been granted special legal protection.  Approving a ROW that extends outside designated utility corridors, particularly without sufficient analysis of the impacts on these sensitive habitats, constitutes undue degradation and undue impairment.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

175.   The ROW unduly degrades and impairs the habitat of the threatened desert tortoise because it disrupts habitat connectivity in the Chemehuevi to Chuckwalla Linkage Zone, destroys critical tortoise habitat, poses risk of injury or death to tortoises during construction, and provides a competitive advantage to tortoise predators.

176.   The ROW unduly degrades and impairs the habitat of bighorn sheep because it disrupts habitat connectivity in an already sensitive and critical connectivity area.

177.   For these reasons, the ROW and LUPA violate FLPMA and the CDCA Plan, and BLM's decision to approve them is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with law and subject to judicial review under the APA, 5 U.S.C. § 706(2).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

(1)   Declare that Defendants' Environmental Assessment and Finding of No Significant Impact violate NEPA, CEQ's NEPA regulations, and DOI's NEPA regulations;

(2)   Declare that Defendants violated NEPA by failing to prepare an Environmental Impact Statement;

(3)   Declare that Defendants violated and continue to violate NEPA by failing to prepare a supplemental NEPA review;

(4)   Declare that Defendants' Decision Record approving the ROW and LUPA violates FLPMA;

(5)   Order BLM to vacate and set aside the Environmental Assessment, Finding of No Significant Impact, Decision Record approving the ROW and LUPA, the ROW, and any other approvals or entitlements conditioned upon or arising out of those documents;

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

(6) Enjoin Defendants from approving or allowing Eagle Crest to construct or operate any facilities associated with the ROW and LUPA, unless and until the Defendants comply with NEPA and FLPMA consistent with the Court's decision;

(7) Award Plaintiffs their reasonable attorneys' fees, costs, expenses, and disbursements associated with this action; and

(8) Grant Plaintiffs such additional relief as the Court may deem just and proper.

DATED:  September 8, 2023      Respectfully submitted,


                                ENVIRONMENTAL LAW CLINIC
                                Mills Legal Clinic at Stanford Law School



                          By:   _____
                                DEBORAH A. SIVAS
                                MATTHEW J. SANDERS
                                STEPHANIE L. SAFDI

                                Attorneys for Plaintiff
                                NATIONAL PARKS CONSERVATION
                                ASSOCIATION