1

2

3

4

5

6

7

8                                    UNITED STATES DISTRICT COURT

9                                    EASTERN DISTRICT OF CALIFORNIA

10

11    NATIONAL PARKS CONSERVATION          No. 2:24-cv-01434-DJC-CKD
      ASSOCIATION,
12
                    Plaintiff,
13                                          **ORDER**

14            v.

15    UNITED STATES BUREAU OF LAND
      MANAGEMENT; TRACY STONE-
16    MANNING, Director of United States
      Bureau of Land Management; and
      KAREN MOURITSEN, Bureau of Land
17    Management California State Director,

18                    Defendants

19            and

20    EAGLE CREST ENERGY COMPANY,
      INC.,
21
                    Intervenor Defendant.
22

23            This case concerns the Bureau of Land Management's ("BLM") decision to

24    amend the California Desert Conservation Area Plan and grant a Right-of-Way to

25    Intervenor Defendant, Eagle Crest Energy Company to "construct, operate, maintain,

26    and decommission a gen-tie [electrical] line and water supply pipeline" necessary for

27    a pumped storage electrical generation project.  The pumped storage electrical

28

generation project was approved and licensed by the Federal Energy Regulatory ("FERC") in 2014, and the Right-of-Way project was approved in 2018. Plaintiff, the National Parks Conservation Association, has brought this suit contending that BLM violated the National Environmental Policy Act ("NEPA") and the Federal Land Policy Management Act ("FLPMA"), and has thereby violated the Administrative Procedure Act ("APA"), in its assessment and grant of the Right-of-Way. While it is apparent that Plaintiff disagrees with FERC's assessment and approval of the underlying Project, this Court is limited to reviewing whether BLM acted in an arbitrary or capricious manner or violated the relevant statutes and regulations in its assessment and approval of the Right-of-Way, not FERC's underlying assessment of the pumped storage electrical generation project. This Court has rejected several similar claims brought by a different plaintiff in *Desert Protection Society v. Haaland*, No. 219-CV-00198-DJC-CKD, 2023 WL 6386901 (E.D. Cal. Sept. 29, 2023), *appeal dismissed*, No. 23-4263, 2024 WL 1193103 (9th Cir. Jan. 8, 2024). In *Desert Protection Society*, this Court found that under the required deferential standard, the defendants – who are the same Defendants in this case – had satisfied their burden of demonstrating that BLM properly conducted its assessment and granting approval of the Project. The facts in *Desert Protection Society* and this case are identical.

Each party – Plaintiff, Defendants, and Intervenor Defendant – has filed a Cross Motion for Summary Judgment. (Pl. Mot. (ECF No. 55-1), Defs.' Mot. (ECF No. 56), Int. Def.'s Mot. (EFC No. 57-1).) While Plaintiffs here utilize a new framing of familiar arguments against those actions, the underlying reasoning – that Defendants acted in a manner that is arbitrary or capricious – has already been addressed and rejected by this Court in large part. For the reasons discussed below and in *Desert Protection Society*, the Court GRANTS Defendants' and Intervenor Defendants' Motion for Summary Judgment in full and DENIES Plaintiff's Motion for Summary Judgment.

////

////

2

### BACKGROUND AND PROCEDURAL HISTORY

In 2014, private developer Eagle Crest Energy Company ("Eagle Crest") received a license from FERC to construct and operate the proposed Eagle Mountain Hydroelectric Pumped Storage Project ("Pumped Storage Project" or "Project"). (ECF No. 19, FAC ¶ 2.) The Project, a large-scale pumped storage electrical generation development, would repurpose a defunct mine near Joshua Tree National Park in Southern California. (ECF No. 57-1, Int. Def.'s Mot. at 2–3.) The Project is slated to occupy approximately 2,700 acres of public and private land and produce up to 1,300 megawatts of energy. (FAC ¶ 2.) Eagle Crest sought a Right-of-Way from BLM to access and construct the required gen-tie line and water pipeline on land that FERC had withdrawn for Eagle Crest's use pursuant to the Federal Power Act, but which was managed by BLM. (Int. Def.'s Mot. at 4–5.) In August 2018, BLM granted Eagle Crest a Right-of-Way to construct and operate a transmission line and a water pipeline near Joshua Tree National Park. (FAC ¶ 1.) The water pipeline, if built, would transport groundwater to the Project, and the transmission line would connect the Project to California's transmission grid. (*Id.*) Water sources in the region are scarce. (*Id.* ¶ 3.) One of those water sources is the Chuckwalla Valley Aquifer, from which the Pumped Storage Project is expected to draw 35 billion gallons over its fifty-year lifetime. (*Id.*)

The public lands comprising the Right-of-Way consist of desert landscapes that provide habitat, food, and genetic connectivity for many plants and animals, including some species listed under the Endangered Species Act ("ESA"). (*Id.* ¶ 3.) Local species include the desert tortoise, which is listed as threatened under the ESA, and the desert bighorn sheep. (Pl. Mot. at 21–25.) The area where the Project is slated to be built is covered by the California Desert Conservation Area Plan ("CDCA Plan"), which provides guidance to protect the region's natural resources. (FAC ¶ 6.)

In 2012, FERC prepared an Environmental Impact Statement ("EIS") assessing the effects of the utility lines and the proposed Right-of-Way. (Pl. Mot. at 12; Int. Def.'s Mot. at 4.) In 2017, BLM prepared an Environmental Assessment ("EA") which

1    incorporated (or "tiered to") the 2012 FERC EIS, AR 015467, but conducted further,

2    more detailed assessment of the impacts of the Right-of-Way specifically.  (*See* Int.

3    Def.'s Mot. at 4–5.)  After completing the EA, BLM concluded that the Right-of-Way

4    would not have a significant impact on the environment, and therefore determined a

5    more comprehensive EIS for the Right-of-Way Project was not necessary.  Instead,

6    BLM issued a Finding of No Significant Impact on August 1, 2018, and a Decision

7    Record approving the plan amendment and granting the Right-of-Way and a Land

8    Use Plan Amendment to the Plan that waived or weakened many of the Plan's

9    conservation mandates, AR 010425–26.  (FAC. ¶ 7.)

10         In the intervening period between the Energy Project's approval and BLM's

11    assessment of the Right-of-Way Project, BLM's California Desert Conservation Area

12    Plan was amended by the Desert Renewable Energy Conservation Plan ("DRECP").

13    (FAC ¶ 46.)  The DRECP established Areas of Critical Environmental Concern ("Area(s)

14    of Critical Concern") and conservation and management actions for certain land uses

15    in the California deserts.  (*See id.*)  Part of the Right-of-Way granted to Eagle Crest

16    runs through an Area of Critical Concern that was designated under the DRECP after

17    FERC approved the Energy Project and withdrew lands for the associated utility lines.

18    *Desert Protection Soc'y*, 2023 WL 6386901, at *2.  Ordinarily, pursuant to the DRECP,

19    any utility lines running through this region would need to be routed through a

20    designated utility corridor.  *Id.*  However, the utility corridor was full, and the siting of

21    the FERC licensed project would not allow for the use of a different utility corridor.  *Id*.

22    To address this inconsistency, BLM amended the relevant land use plan, the CDCA

23    Plan, to allow a portion of the Right-of-Way to exist outside the designated utility

24    corridor.  *Id.*  The CDCA Plan amendment was assessed within the EA for the Right-of-

25    Way Project.  *Id.*; AR 015480–82.

26         Plaintiff is the National Parks Conservation Association, the nation's only non-

27    profit organization solely committed to protecting and enhancing the National Park

28    System for current and future generations.  (FAC ¶ 14.)  The organization has more

4

than 1.6 million members and supporters, many who reside in, explore, and enjoy the native ecosystems of the California desert and Joshua Tree National Park. (*Id.*) Plaintiff brings this action on its own institutional behalf and on behalf of its members whose interests would be harmed by Defendants' actions. (*Id.* ¶ 15.) Plaintiff is represented by the Stanford Environmental Law Clinic, whose students appeared and capably presented at oral argument for this matter.

Defendants include the U.S. Bureau of Land Management, a federal agency within the Department of the Interior. (*Id.* ¶ 16.) BLM is responsible for the administration of the federal public lands at issue in this case, including the lands subject to the Right-of-Way and Land Use Plan Amendment. (*Id.* ¶ 16.) Defendants also include Tracy Stone-Manning, who is the (now former) Director of BLM, and Karen Mouritsen, who is BLM's (now former) State Director for California, both of whom are sued in their official capacity. (*Id.* ¶¶ 17, 18.) Intervenor Defendant is Eagle Crest Energy Company. (ECF No. 11.)

Plaintiff brings two claims. First, Plaintiff alleges that Defendants violated the National Environmental Policy Act by improperly tiering to the 2012 FERC EIS, considered too narrow a range of alternatives, not preparing an EIS, and by not taking a hard look at specific direct and cumulative impacts of the Right-of-Way and Land Use Plan Amendment. (FAC ¶¶ 142–63.) Second, Plaintiffs allege that Defendants violated the Federal Land Policy Management Act and the CDCA Plan by allowing environmental harms to impact the desert landscape under BLM's purview. (*Id.* ¶¶ 164–70.)

Plaintiffs request that this Court: (1) declare that Defendants' Environmental Assessment and Finding of No Significant Impact violate NEPA, the Council for Environmental Quality's NEPA regulations, and the Department of the Interior's NEPA regulations; (2) declare that Defendants violated NEPA by failing to prepare an Environmental Impact Statement; (3) declare that Defendants' Decision Record approving the Right-of-Way and Land Use Plan Amendment violates FLPMA; (4) Order

1    BLM to vacate and set aside the Environmental Assessment, Finding of No Significant

2    Impact, Decision Record approving the Right-of-Way and Land Use Plan Amendment,

3    the Right-of-Way itself, and any other approvals or entitlements conditioned upon or

4    arising out of those documents; (5) enjoin Defendants from approving or allowing

5    Eagle Crest to construct or operate any facilities associate with the Right-of-Way and

6    Land Use Plan Amendment, unless and until Defendants comply with NEPA and

7    FLPMA consistent with this Court's decision, if it finds in Plaintiff's favor; (6) award

8    Plaintiff its reasonable attorneys' fees, costs, expenses, and disbursements associated

9    with this action; and (7) grant Plaintiff such additional relief as the Court may deem just

10   and proper.  (FAC at 43–44.)

11         Plaintiff avers it did not become aware of the *Desert Protection Society* case

12   until February 15, 2023.  (FAC ¶ 140.)  Plaintiff did not seek to intervene in that case,

13   and instead, on September 8, 2023, filed its own complaint against BLM in the U.S.

14   District Court for the Central District of California.  (ECF No. 1.)  The case was

15   transferred to this Court on May 20, 2024, due to the similarities between this case

16   and *Desert Protection Society*.  (ECF No. 41.)  On September 29, 2023, this Court

17   granted summary judgment in full for the *Desert Protection Society* Defendants.  Oral

18   argument for the instant case was held on May 1, 2025, and the matter was submitted.

19                              **LEGAL STANDARD**

20         Ordinarily, summary judgment is appropriate under Rule 56 where the moving

21   party "shows that there is no genuine dispute as to any material fact and the movant is

22   entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  However, "[i]n a case

23   involving review of a final agency action under the Administrative Procedure Act . . .

24   the standard set forth in Rule 56(c) does not apply because of the limited role of a

25   court in reviewing the administrative record."  *Sierra Club v. Mainella*, 459 F. Supp. 2d

26   76, 90 (D. D.C. 2006).  "A court conducting APA judicial review does not resolve

27   factual questions, but instead determines 'whether or not as a matter of law the

28   evidence in the administrative record permitted the agency to make the decision it

                                        6

1   did.'" *Conservation Cong. V. U.S. Forest Serv.*, No. 2:12-CV-02800-TLN, 2014 WL

2   2092385, at *4 (E.D. Cal. May 19, 2014) (quoting *Mainella*, 459 F. Supp. 2d at 90). In a

3   case brought under the Administrative Procedure Act, summary judgment is the

4   "mechanism for deciding, as a matter of law, whether the agency action is supported

5   by the administrative record and otherwise consistent with the APA standard of

6   review." *Conservation Cong.*, 2014 WL 2092385, at *4.

7        Because NEPA and FLMPA – the statutes which Plaintiff alleges Defendants

8   violated – do not allow a private right of action, the agency's decisions will be

9   reviewed under the APA. *See Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d

10  1233, 1238 (9th Cir. 2005). Under the APA, a decision may be set aside if it is

11  "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

12  *Id.*; 5 U.S.C. § 706(2)(A). Such review "is narrow and a court is not to substitute its

13  judgment for that of the agency." *Motor Vehicle Mfgrs. Ass'n v. State Farm Mut. Auto.*

14  *Ins. Co.*, 463 U.S. 29, 43 (1983). Accordingly, a court may only set aside a decision if

15  the agency "has relied on factors which Congress has not intended it to consider,

16  entirely failed to consider an important aspect of the problem, offered an explanation

17  for its decision that runs counter to the evidence before the agency, or is so

18  implausible that it could not be ascribed to a difference in view or the product of

19  agency expertise." *Id.*

20                          **DISCUSSION**

21       Plaintiff brings two claims, the first of which has four subclaims. First, Plaintiffs

22  allege that Defendants violated NEPA by: (1) impermissibility tiering the 2017 EA

23  prepared for the Right-of-Way and Land Use Plan Amendment to the 2012 FERC EIS

24  for both groundwater and local wildlife; (2) adopting an impermissibly narrow project

25  purpose and need that resulted in an unreasonable range of alternatives; (3) failing to

26  prepare an EIS; and (4) failing to take a hard look at the direct and cumulative impacts

27  of the Right-of-Way and Land Use Plan Amendment. (FAC ¶¶ 142–63.) Second,

28  Plaintiffs allege that Defendants violated the FLPMA and the CDCA Plan by allowing

                              7

1   environmental harms to impact the desert landscape and its species under BLM's

2   purview.  (*Id.* ¶¶ 164–70.)

3   **I.    Compliance With NEPA Requirements**

4        Plaintiff alleges that BLM improperly relied on the 2012 EIS prepared by FERC,

5   which Plaintiff views as deficient.  Plaintiff also asserts that the EA prepared by BLM did

6   not adequately supplement or address the deficiencies in the EIS.  Plaintiff further

7   contends that BLM violated NEPA by failing to prepare a separate EIS for the Right-of-

8   Way approval.[1]

9        While an agency must take a "hard look" at the environmental consequences of

10  a project, it may "tier to [or incorporate] an EIS that reflects such analysis."  *Native*

11  *Ecosystems Council v. Dombeck*, 304 F.3d 886, 895–96 (9th Cir. 2002).  "In general, an

12  agency preparing an EA . . .  is not required to reevaluate the analyses included in the

13  relevant project's EIS."  *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d

14  497, 511 (D.C. Cir. 2010).  Instead, NEPA regulations allow 'tiering,' which permits site-

15  specific environmental analyses to incorporate by reference the general discussions of

16  prior, broader environmental impact statements.  *Id.* at 511–512.  That is, agencies are

17  permitted to rely on environmental studies developed by other agencies.  The

18  essential question before the Court is whether BLM took a "hard look" at all the factors

19  relevant to the proposed Right-of-Way and sufficiently supplemented the FERC EIS in

20  areas where the EIS did not address the particular impacts of the Right-of-Way.

21       Separately, Under NEPA, a federal agency must prepare an EIS when it

22  proposes to undertake "major Federal actions significantly affecting the quality of the

23  human environment."  42 U.S.C. § 4332; 40 C.F.R. § 1508.1; *Morongo Band of Mission*

24  *Indians v. F.A.A.*, 161 F.3d 569, 575 (9th Cir. 1998).  To determine whether an EIS is

---

25

26  [1] The Court notes that the Council on Environmental Quality conducted a major overhaul of the
    regulations implementing NEPA in 2020, which were later revised in May 2022.  Both amendments

27  occurred after BLM conducted its EA and issued its decision.  Because the previous regulations were
    controlling at the time BLM conducted its initial assessment, the Court will refer to the then-existing

28  regulations and requirements, which may or may not be requirements under the current regime.  A
    copy of the relevant historical regulations is appended to this Order.

1   needed, an agency will first prepare an EA to assess whether the project will have a

2   significant effect on the environment, thereby requiring an EIS.  *Morongo Band of*

3   *Mission Indians*, 161 F.3d at 575.  Where "substantial questions are raised as to

4   whether a project . . . may cause significant degradation of some human

5   environmental factor," an EIS is required.  *LaFlamme v. FERC*, 852 F.2d 389, 397 (9th

6   Cir.1988) (internal quotations and emphasis omitted).  If the agency instead

7   determines there will be no significant impact, the agency will issue a Finding of No

8   Significant Impact and is not required to issue an EIS.  *Morongo Band of Mission*

9   *Indians*, 161 F.3d at 575.

10         An agency's determination about a proposed project's impact and whether an

11  EIS is required is reviewed under the arbitrary and capricious standard.  Federal courts

12  are limited to only reviewing whether the agency "has taken the requisite 'hard look' at

13  the environmental consequences of its proposed action" and "whether the agency

14  decision is 'founded on a reasoned evaluation of the relevant factors.'" *Greenpeace*

15  *Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir. 1992) (quoting *Marsh v. Or. Natural*

16  *Res. Council*, 490 U.S. 360, 373–74, 378 (1989) (internal quotations omitted)).  If the EA

17  "fail[s] to address certain crucial factors, consideration of which was essential to a truly

18  informed decision whether or not to prepare an EIS," the decision not to issue an EIS

19  will be considered arbitrary and capricious.  *Found. for N. Am. Wild Sheep v. U.S.*

20  *Dep't of Agric.*, 681 F.2d 1172, 1178 (9th Cir. 1982).  The decision about whether to

21  create an EIS is "a classic example of a factual dispute the resolution of which

22  implicates substantial agency expertise."  *Headwaters, Inc. v. Bureau of Land Mgmt.,*

23  *Medford Dist.*, 914 F.2d 1174, 1177 (9th Cir. 1990) (quoting *Marsh*, 490 U.S. at 374).

24         The Court concludes that BLM properly considered and tiered to the 2012

25  FERIC EIS and that the creation of its own independent EA, rather than an EIS, is

26  proper.

27  ////

28  ////

1       **A.    Analysis of Environmental Impacts**

2         **1.  Direct and Cumulative Ground Water**

3       Plaintiff identifies that over the fifty-year lifetime of the Energy Project, over 35

4 billion gallons of groundwater from the Chuckwalla Valley Aquifer ("Aquifer") would

5 be used.  AR 018390, 018410 (noting 109,620 acre-feet of estimated water usage).

6 This is separate from the current state of the Aquifer, which Plaintiff argues is already

7 in a state of overdraft.  *See* AR 009762.  Plaintiff believes that BLM erred by not

8 accounting for the Right-of-Way-authorized water pipeline's direct and indirect impact

9 on the Aquifer and groundwater in its EA.  (Pl. Mot. at 17.)  Instead, BLM relied on the

10 2012 FERC EIS, which found a net-positive groundwater balance over the fifty-year

11 project period.  AR 015467, 015584.

12       NEPA requires BLM to "ensure the professional integrity, including scientific

13 integrity, of the discussions and analyses in environmental documents."  40 C.F.R.

14 § 1502.24.  As to the direct effects on groundwater, Plaintiff posits that BLM's tiered

15 reliance failed to account for a body of scientific data including several studies that, if

16 incorporated, would have led to a different result.  (Pl. Mot. at 17; ECF No. 58, Pl.

17 Reply, at 4.)  Relatedly, Plaintiff points to BLM's reliance on the 2012 FERC EIS in

18 reaching BLM's conclusion that groundwater recharge in the Aquifer would have a

19 net-positive balance over the Project's fifty-year lifespan.  (Pl. Mot. at 17.)  Plaintiff

20 argues that the 2012 FERC EIS' foundation is flawed because it overestimates

21 groundwater recharge, a conclusion that BLM itself at one point agreed with.  *See* AR

22 018187, 009762.  BLM commissioned its own studies to assess groundwater recharge

23 that employed more accurate scientific analyses to find a lower Aquifer recharge rate

24 than FERC has concluded, but then solely relied on the existing 2012 FERC EIS when

25 creating its EA.  (Pl. Mot. at 18.)

26       The studies identified by Plaintiff and commissioned by BLM are Godfrey,

27 *Groundwater and Large-Scale Renewable Energy Projects on Federal Land:*

28 *Chuckwalla Valley Groundwater Basin* (2012) (AR 018829–019030); Argonne, *A*

1   *Groundwater Model to Assess Water Resource Impacts at the Riverside East Solar*

2   *Energy Zone* (2013) (AR 002692–735), and; Shen, *Impact of Water Use by Utility-Scale*

3   *Solar on Groundwater Resources of the Chuckwalla Basin, CA: Final Modeling Report*

4   (2017) (AR 023751–790).  But Plaintiff does not explain how the conclusions of these

5   studies would necessitate a different outcome in BLM's analysis, and the Court cannot

6   itself draw scientific conclusions from the existence of these studies or weigh their

7   analytic techniques.  Regardless, BLM appears to have satisfied its requirement of

8   assessing relevant contemporary data in reaching its conclusion.  For example,

9   Defendants persuasively points out that BLM considered a wide range of data,

10  including data from the State Water Resources Board and other government reports,

11  and incorporated a variety of available sources that include various studies to reach its

12  conclusion.  *See* AR 004450 (identifying the data considered by BLM).

13          Plaintiff's contention is essentially that BLM relied on some studies but not

14  others and gave a different weight to those studies than Plaintiff would have.  The

15  Court need not assess whether BLM's actions were perfect, only that they were

16  reasonable.  *See Audubon Soc'y of Portland v. Haaland*, 40 F. 4th 967, 987 (9th Cir.

17  2022.)  Even though Plaintiff can identify additional studies that BLM could have or

18  perhaps should have considered, the lack of these studies' incorporation into the EA

19  does not render the EA invalid because the body of knowledge consulted by BLM was

20  still sufficient to properly support its conclusion.  BLM's consideration of a wide range

21  of scientific sources ultimately supports its findings, and the Court declines to view the

22  absence of consideration of Plaintiff's identified studies as fatal to the EA.

23          As to the cumulative effects on groundwater, Plaintiff briefly asserts that BLM

24  failed to analyze three discrete cumulative impacts in its EA: (1) the effects of the water

25  pipeline on the Colorado River; (2) the effects of overdraft on local springs; and (3) the

26  impact of six new solar projects on its water-usage estimates.  (Pl. Mot. at 19.)  These

27  arguments are also unavailing.

28

1    First, Plaintiff argues that BLM never accounted for any impacts on the Colorado

2    River.  The record does not support this argument.  For example, in its EA, BLM

3    explicitly discusses a U.S. Geologic Survey analysis that estimated the Colorado River's

4    water levels in relation to the Chuckwalla Valley groundwater basin.  AR 018391–92.

5    After assessing that data, BLM concluded that "[g]roundwater use by the Project will

6    not have an adverse effect on the Colorado River Accounting Surface and, in turn,

7    would not result in an unauthorized diversion of the Colorado River."  AR 018392.

8    This data was also considered in FERC's 2012 EIS, and was properly relied on by BLM.

9    The Court defers to BLM's reasonable findings regarding any potential impact on the

10   Colorado River.  *See Conservation Cong. v. United States Forest Serv.*, 377 F. Supp. 3d

11   1039, 1055 (E.D. Cal. 2019), *aff'd*, 805 F. App'x 520 (9th Cir. 2020) ("Courts have held

12   that if a plaintiff disagrees with the science relied on by the agency, the court must

13   give deference to the agency who relied on their experts and took reasonable

14   actions.").

15   Second, BLM properly assessed the effects on local springs in its EA.  When

16   discussing the intermittent springs in the northwest part of the Chuckwalla Valley, the

17   EA notes that "[a]ll of these springs appear to be hydrologically disconnected from the

18   Chuckwalla groundwater basin since the springs are located in the mountains above

19   the valley floors."  AR 018353.  The EA's conclusion appears in part based on, and

20   incorporates, a 1994 National Parks Service memorandum, which also assesses the

21   area's local springs.  *Id.*; AR 002124.  That is to say, contrary to Plaintiff's allegations,

22   the record indicates that BLM did consider impacts on local spring and looked to

23   existing analyses to inform its decision.

24   Finally, the Court concludes that BLM acted properly in not accounting for six

25   potential large-scale solar projects – Desert Quartzite, Crimson Solar, Jupiter (now

26   known as Victory Pass), Io Solar, SunPower, and Arica – in its study on environmental

27   impacts of the Energy Project.  *See* AR 004452–53.  Those projects will, of course, have

28   an impact on the local environment, including affecting local groundwater supply.

1    However, as Intervenor Defendant fairly points out (Int. Def. Mot. at 15), when

2    preparing the EA, those projects were not yet in a development stage where their

3    effects could be properly accounted for in an EA, and one of those projects had not

4    even applied for BLM approval.  AR 004454.  Plaintiff does not demonstrate that BLM

5    possessed or could have accessed usable data on these projects to appropriately

6    factor them into any EA analysis.  *See Earth Island Inst. v. Nash*, 607 F. Supp. 3d 1056,

7    1078–79 (E.D. Cal. 2022) (finding that external projects in their preliminary

8    development plans need not be incorporated into an environmental review).  Given

9    this lack of data, the Court cannot conclude the omission of these projects from the EA

10   was arbitrary or capricious.

11        This conclusion is consistent with the conclusion drawn by this Court in

12   response to related arguments raised in *Desert Protection Society*.  While the plaintiffs

13   in that case centered their argument on the impact of climate change on ground

14   water overdraft, this Court still found that the FERC EIS properly applied a hard look at

15   the effect of the Energy Project on the Aquifer's water levels.  *Desert Prot. Soc'y*, 2023

16   WL 6386901 *6.  In the previous lawsuit, when reviewing BLM's actions, this Court

17   looked at BLM's supplementation of the data available in the FERC EIS.  This Court

18   held that contrary to the plaintiff's claims, BLM fairly arrived at the conclusion that "in

19   the long term the Energy Project will not cause the aquifer to be over drafted because

20   recharge of the basin is expected to exceed withdrawals for the majority of the 50-

21   year license period."  *Id*.  The Court reached this conclusion after reviewing BLM's

22   acknowledgment that "the FERC project is likely to be less impactful than FERC initially

23   predicted because there will be fewer additional projects utilizing water than

24   previously thought."  *Id*.  That same conclusion is applicable here.  *See id*. (noting this

25   Court's observation that BLM did not need to "conduct further inquiry . . . after

26   concluding the Right-of-Way Project would have no significant impact on groundwater

27   regardless of evaporation").

28   *////*

1        **2. Wildlife**

2        Plaintiff contends that BLM's analysis did not properly account for any

3 environmental threats against the local desert tortoise and desert bighorn sheep

4 populations in its EA, thereby violating NEPA. More specifically, Plaintiff alleges that

5 BLM did not account for how the Right-Of-Way facilities would sever regions of desert

6 tortoise connectivity, exacerbate disturbances from construction, and increase the

7 threat of desert tortoises' survival from ravens and other predators. (Pl. Mot. at 21.)

8 Plaintiff further asserts that BLM's analysis did not account for the impacts on bighorn

9 sheep migratory patterns, including any potential effects on physical spaces serving as

10 a corridor between the Eagle Mountain herd and the Coxcomb Mountain herd. (*Id.* at

11 24–26.)

12        The question before the Court is whether BLM properly took a hard look at the

13 factors relevant to the proposed Right-of-Way and sufficiently supplemented the FERC

14 EIS in areas where the EIS did not address the particular impacts of the Right-of-Way.

15 *Desert Prot. Soc'y*, 2023 WL 6386901, at *4; *see Bark v. U.S. Forest Serv.*, 958 F.3d 865,

16 872–73 (9th Cir. 2020). This Court has already addressed parallel arguments

17 concerning the desert tortoise. *See Desert Prot. Soc'y*, 2023 WL 6386901, at *8. In

18 *Desert Protection Society*, this Court recognized that "[n]ot only did FERC conduct

19 multiple surveys analyzing the right-of-way's impact on the desert tortoise, which BLM

20 tiered to, but BLM conducted an updated comprehensive survey on the desert

21 tortoise in 2016, which it included with the Environmental Assessment." *Id.* BLM's

22 procedural obligations under NEPA require it to assess relevant data and ensure its

23 conclusions are reasonably grounded in that data. Here, as discussed in *Desert*

24 *Protection Society*, BLM has met that burden. While it relied in part on the 2021 FERC

25 EIS, it conducted its own tortoise survey, and after weighing the data before it,

26 determined that the tortoise would not be impacted by the Right-of-Way.

27        Moreover, Plaintiff's attempts to distinguish *Desert Protection Society* as it

28 relates to the desert tortoise are unpersuasive. Plaintiff seeks to cabin this Court's

1    previous holding to effects to the pumped storage project and not the Right-of-Way.

2    (Pl. Mot. at 26.)  But that is inconsistent with this Court's previous opinion, which

3    explicitly identified the nexus between the Right-of-Way and impacts on desert

4    tortoises.  *Desert Prot. Soc'y*, 2023 WL 6386901, at *8.  Nothing in Plaintiff's briefing

5    causes the Court to revisit its earlier conclusion that "BLM satisfactorily assessed the

6    project's impacts on wildlife by both tiering to the FERC EIS which addressed the

7    impacts, and by supplementing the EIS with a new study on the desert tortoise and

8    other burrowing animals which may be impacted by the project."  *Id*. at *9.  Plaintiff's

9    new argument that increases in raven predation on desert tortoises as a result of the

10    Right-of-Way's facilities is not compelling.  (*See* Pl. Mot. at 23.)  As Plaintiff sees it, BLM

11    failed to account for increases in raven food sources (via roadkill) and the addition of

12    new physical facilities that support raven perching and nesting, which would in turn

13    support greater populations of ravens that would prey on tortoises.  (*Id*.)  But BLM

14    explicitly explained how it accounted for any increase in raven predation.  For

15    example, as an initial matter, BLM reasonably questioned any increase in raven

16    population, noting that there are "a substantial number of existing similar features in

17    the Project vicinity that already attract and subsidize ravens."  AR 015649.  And BLM

18    fairly points to a FERC-mandated Predator Monitoring and Control Plan that would

19    mitigate against potential predation risks, including by ravens.  *Id*.

20         Plaintiff also views the tiering to the 2012 FERIC EIS as insufficiently accounting

21    for bighorn sheep, which Plaintiff sees as creating a deficiency for the subsequent EA.

22    (FAC ¶ 146; Pl. Mot. at 21–26.)  As to Plaintiff's contentions about bighorn sheep,

23    based on the available evidence in the administrative record the Court finds that BLM

24    sufficiently identified and accounted for any potential hazards to the local bighorn

25    sheep population.  For example, BLM specifically identified the bighorn sheep

26    populations in the area around the Energy Project.  AR 016336-37.  In the EA, BLM

27    also discussed a 2010 study examining local bighorn sheep populations,

28    acknowledging there were 51 identified sheep in six different locations across a 10-

1    mile radius of the site.  *Id.*  BLM also assessed, albeit briefly, how those bighorn sheep

2    would be impacted by the project, identifying and discussing at least one study that

3    "includes information about the sensitivity of bighorn sheep to various types of

4    disturbances."  AR 017483.  In other words, the record supports BLM's assertions that

5    it had assessed impacts on bighorn sheep local to the Project area.  Again, it is not the

6    role of the Court to second guess the BLM's analysis if it is properly supported by

7    available data.  *See Motor Vehicle Mfgrs. Ass'n*, 463 U.S. at 43.

8           Plaintiff argues that BLM failed to consider how the Project and Right-of-Way

9    would impact the migratory corridor between the Eagle Mountain herd and the

10   Coxcomb Mountain herd.  (Pl. Mot. at 24.)  This corridor is particularly "important for

11   maintaining connectivity among desert bighorn herds within Joshua Tree National

12   Park."  AR 19692.  Plaintiff asserts that the Project and Right-of-Way could restrict

13   movement or interactions between the herds, thereby limiting genetic diversity.

14   Relatedly, Plaintiff also argue that BLM improperly minimized the extent to which the

15   Eagle Mountain and Coxcomb Mountain herds rely on the corridor.  (Pl. Mot. at 24.)

16   Plaintiff points to BLM's statement that bighorn sheep are not likely to traverse the

17   Project's "heavily mined" area, noting that BLM later acknowledges that those same

18   sheep have been known to drink water from the mining pits after it rains.  AR 015574.

19          Plaintiff's arguments misrepresents the record.  The sentence following

20   Plaintiff's quoted text indicates: "Installation of fences around the reservoirs as

21   proposed by Eagle Crest would prohibit this access."  *Id.*  And BLM's discussion here

22   disproves Plaintiff's first point – that BLM failed to consider how the Project and Right-

23   of-Way would impact the bighorn sheep migratory corridor.  BLM extensively

24   discusses this corridor and how it envisions reducing effects on the sheep; it simply is

25   not accurate to state that BLM failed to acknowledge the corridor.  *See id.*  Plaintiff's

26   contention appears to be that BLM reached unsatisfactory conclusions, rather than

27   BLM failed to assess effects related to the migratory corridor between the two bighorn

28   sheep populations.  But BLM's obligations under NEPA are purely procedural; it is not

1   the purview of this Court to review an agency's conclusions if the proper procedural

2   steps are taken, as done so here.  *See Seven Cnty. Infrastructure Coal. v. Eagle Cnty.,*

3   *Colorado*, 145 S. Ct. 1497, 1507 (2025) ("NEPA imposes no substantive environmental

4   obligations or restrictions.  NEPA is a purely procedural statute . . .).

5          And finally, Plaintiff faults BLM for not considering the construction and

6   operation of the Right-of-Way facilities.  Oddly, Plaintiff views the previous observation

7   that mining pits would be fenced off as an indicator that the Right-of-Way facilities

8   would "disrupt bighorn migratory sheep patterns."  (*See* Pl. Mot. at 24–25.)  Yet, the

9   fencing-off of those pits is a remedy to Plaintiff's other concern that bighorn sheep are

10  being drawn to the area to drink water.[2]  Plaintiff cannot identify concerns and then

11  attack Defendants' attempts to fix those concerns as evidence of further disruption to

12  the species.

13         The Court concludes that BLM properly assessed effects on the bighorn sheep,

14  including effects pertaining to the migratory corridor between the Eagle Mountain

15  and Coxcomb Mountain herds.

16                        **3.  Impermissible Tiering**

17         Plaintiff asserts that BLM improperly tiered to the 2012 FERC EIS, which was

18  "inadequate to support future decisions" such as the granting of the Right-of-Way.

19  (FAC ¶ 144–45.)  Specifically, Plaintiff argues that the 2012 EIS was inadequate at the

20  time it was prepared, and continued to be inadequate when BLM relied on it to

21  prepare its EA, particularly with respect to groundwater impacts associated with the

22  Right-of-Way and Land Use Plan Amendment and associated Energy Project.  (*Id.*

23  ¶ 145; Pl. Mot. at 16–21, 26–28.)

24

25  [2] As Intervenor Defendant points out, the fencing in of these mining pits is also done to protect the
    desert tortoise as required by the U.S. Fish and Wildlife Service.  *See* AR 020425 ("However, [U.S. Fish
26  and Wildlife Service's] Biological Opinion prohibits Eagle Crest from providing drinking water for any
    desert wildlife, on the grounds that it would adversely affect the desert tortoise by attracting or
27  subsidizing predators, such as coyotes, wild dogs, ravens, and gulls, which would benefit from the new
    water supply. As a result, the [FERC] license does not include any measures for providing access to
28  water in the project reservoirs for bighorn sheep or other species.").

1    Plaintiff's arguments here are essentially the same arguments it has already

2    raised – that the 2012 FERC EIS improperly accounted for effects on groundwater

3    resources impacts on local wildlife.  This Court has already held that BLM permissibly

4    tiered to the 2012 FERC EIS in several instances, both in this Order and in the previous

5    case which extensively litigated this issue, validating that procedure.  *See generally*,

6    *Desert Prot. Soc'y*, 2023 WL 6386901.  The Court affirms its previous findings in this

7    Order.  While the Court recognizes the 2012 FERC EIS contains flaws, the Court

8    cannot disapprove of a federal agency decision merely on the basis that there are

9    disagreements about how that agency weighed available data.  Challenges to the

10    2012 FERC EIS would have properly come when that EIS was being developed, not in

11    litigation more than a decade later over subsequent approvals.

12        **4.  BLM's Decision to Prepare an EA instead of an EIS**

13    Prior to implementing certain agency actions, an agency must first prepare an

14    environmental assessment, or "EA," describing initial environmental impacts of the

15    action.  *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d

16    1172, 1185 (9th Cir. 2008) (citing 40 C.F.R. § 1508.9(a)(1)).  An EA is a "'concise public

17    document' that '[b]riefly provide[s] sufficient evidence and analysis for determining

18    whether to prepare an environmental impact statement or a finding of no significant

19    impact.'"  *Id.* (quoting 40 C.F.R. § 1508.9(a)(1)).  For "major Federal actions

20    significantly affecting the quality of the human environment" or instances where

21    substantial questions are raised as to potential environmental effects, NEPA requires a

22    federal agency to prepare an EIS.  42 U.S.C. § 4332(2)(C); *Ocean Advocs. v. U.S. Army

23    Corps of Eng'rs*, 402 F.3d 846, 864–65 (9th Cir. 2004).  An EIS is not required if the EA

24    does not find that there will be a significant environmental impact; in those instances,

25    an EA alone is sufficient.  When assessing whether a project will produce a significant

26    impact, the Court is tasked with weighing a number of factors, including as relevant

27    here whether the project's impacts will be "highly uncertain" or "highly controversial."

28    40 C.F.R. §§ 1501.3(d), 1508.27(b)(4)–(b)(5)

1    Here, BLM prepared an EA and not an EIS, and as discussed, tiered to the

2  previous FERC EIS.  Plaintiff argues that the unknown impacts and uncertainty

3  associated with the Project would necessitate the production of an EIS, rather than

4  solely creating an EA.  (Pl. Mot. at 28–29.)  However, Plaintiff grounds this argument to

5  its previous assertion that the Project's groundwater and wildlife impacts are

6  significant.  (*Id.* at 29.)  This Court has already addressed those arguments, finding

7  them to be unpersuasive in light of the administrative record and this Court's required

8  deference to BLM's decision making.

9    Here, Plaintiff also undergirds its argument by pointing to comments from other

10 agencies and organizations that Plaintiff views as reflecting uncertainty and

11 controversy behind the project's groundwater impacts.  For example, Plaintiff points

12 to the Parks Service's commentary that there is "substantial scientific controversy

13 regarding the effects of the project," AR 20360–61, and from The Nature Conservancy

14 requesting an EIS with "analysis of significant new data that has been developed

15 following FERC's EIS . . . [including] results of two groundwater models that BLM itself

16 sponsored," AR 17609.  But as discussed throughout this Order – and in *Desert*

17 *Protection Society* – BLM properly assessed the data before it and determined there

18 was not substantial scientific controversy, and certainly not to the extent that it would

19 require additional steps beyond an EA that tiered to FERC's previous EIS.  That is, the

20 Court has already rejected the underlying merit of Plaintiff's argument.  Accordingly,

21 that argument cannot be used to substantiate a claim that the agency was required to

22 create an EIS.

23    The same can be said regarding Plaintiff's argument that there is uncertainty

24 and controversy regarding the Project's impacts on bighorn sheep and desert

25 tortoises.  Plaintiff points to data gaps regarding impacts on juvenile tortoise

26 populations as well as a lack of information on bighorn sheep migration studies.  As

27 with before, the Court has already determined that BLM properly took a hard look at

28 those species in the permitting of the Project.  Plaintiff unavailingly relies on

1    *Environmental Defense Center v. Bureau of Ocean Energy Management*, 36 F. 4th 850,

2    881–82 (9th Cir. 2022), for the proposition that any uncertainty that could be cured by

3    additional studies would necessitate an EIS, rather than an EA. (*See* Pl. R. at 5.)  But

4    that case is distinguishable.  In *Environmental Defense Center*, the federal agency

5    failed to collect any data on the impact of certain chemicals in sea water before

6    issuing an EA.  36 F.4th at 880–81.  But, as Plaintiff itself points out, BLM has access to

7    a number of studies assessing the impact of the Project on both local water tables and

8    wildlife.  Plaintiff's main contention, rather, is that BLM weighted the studies differently

9    than how Plaintiff would.  While this may be a valid criticism, it itself is not a reason to

10   require an EIS rather than an EA, and the Court is not the proper agent to evaluate

11   BLM's reliance on specific studies over others.

12                **5. BLM's Consideration of a Reasonable Range of Alternatives**

13          Plaintiff avers that BLM failed to meet NEPA's requirement to "give full and

14   meaningful consideration of all reasonable alternatives" in its EA.  (Pl. Mot. at 31.)  But

15   Plaintiff exaggerates the standards applying to EAs.  Plaintiff quotes from *Western*

16   *Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013) to support its

17   argument that BLM needs to have given "full and meaningful consideration of all

18   reasonable alternatives," but does not quote the second part of that sentence, which

19   specifies that when preparing an EA, an "agency's obligation to discuss alternatives is

20   less than in an EIS."  (Internal quotations omitted.)  While an EA must examine viable

21   alternatives, an agency is not required to consider alternatives that are "remote and

22   speculative."  *Westlands Water Dist. v. U.S. Dept. of Interior*, 376 F.3d 853, 868.

23   (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519,

24   551 (1978)).

25          Plaintiff argues that BLM failed to account for a reasonable range of

26   alternatives.  Plaintiff's argument fails.  This Court, explicitly in *Desert Protection*

27   *Society*, and in alignment with binding Ninth Circuit precedent, recognized that an

28   agency's evaluation of a preferred alternative and a no action alterative satisfies the

1   requirements of NEPA.  2023 WL 6386901, *14 ("BLM's consideration of the preferred

2   alternative and no action alternative satisfies the requirements of NEPA."); *see Ctr. for*

3   *Biological Diversity v. Salazar*, 695 F.3d 893, 915–16 (9th Cir. 2012) (upholding

4   agency's decision to only examine in detail the preferred and no action alternatives in

5   the Environmental Assessment).  As Plaintiff recognized in its briefing, BLM *did*

6   consider both a preferred alternative and the no action plan.  (Pl. Mot. at 32 ("BLM

7   evaluated only one alternative aside from 'no action.'" (emphasis omitted).)  Therefore,

8   there can be no dispute that BLM satisfied its requirements to assess alternatives as

9   part of drafting its EA, because as both parties acknowledge, BLM considered an

10  alternative in addition to the no-action alternative.

11        Separately, Plaintiff points to one specific alternative that it alleges BLM failed to

12  adequately assess – that of transferring the land for the Energy Project to the National

13  Parks Service so it could incorporate it into Joshua Tree National Park, rather than

14  approving development.  (*Id.*)  Calling this the "reintegration alternative," (Pl. Mot. at

15  32), Plaintiff posits that BLM erred by not examining the effect it would have and

16  instead focusing on a "No Action Alternative," *see* AR 015529.  But as Intervenor

17  Defendant fairly points outs, functionally, the no-action alternative and the

18  reintegration alternative are the same within the context of this Project, as both would

19  terminate in denying any Right-of-Way permit.  (*See* Int. Def. Mot. at 35–36.)

20  Regardless, it does not appear to the Court that the reintegration alternative was a

21  reasonably viable option that could even be considered in the first place, given that it

22  would involve BLM ceding land over to a National Park, which would then require

23  Congressional or Secretarial approval of the expansion of the Park.  Indeed, Plaintiff

24  even recognizes that this option would only be hypothetical until the point that the

25  Secretary of Interior approves the addition.  (Pl. Mot. at 33.)  BLM need not consider

26  every hypothetical option before moving forward with a Project, nor is it reasonable to

27  require developers to consider myriad and unquantifiable theoretical options when

28  developing new projects.  Indeed, doing so would severely stymie the agency's ability

1    to create new development, even in situations as this one where the agency is only

2    required to create an EA, rather than a more exhaustive EIS.

3    **II.        FLPMA, the CDCA, and the CDCA Plan**

4            BLM is required to "manage the public lands . . . in accordance with the land

5    use plans developed by [the Secretary] under section 1712 of this title when they are

6    available . . . ." 43 U.S.C. § 1732(a).  The California Desert Conservation Area (CDCA)

7    Plan is the relevant land use plan with which BLM must comply.  In the interim period

8    between when the FERC Energy Project was approved and when Eagle Crest applied

9    for a Right-of-Way with BLM, the California Conservation Plan was amended by the

10   2016 DRECP to include strengthened protections for some areas of the California

11   desert.

12           The Right-of-Way was not compliant under the DRECP.  BLM addressed this

13   conflict by approving a concurrent project-specific amendment to the land use plan,

14   which it assessed in the same EA, and approved in the same Decision Record, as the

15   Right-of-Way itself.  The 2016 DRECP also provided new or strengthened protection

16   for certain areas, including Areas of Critical Concern.  Under 43 U.S.C. § 1712(c)(3),

17   BLM is required to "give priority to the designation and protection of areas of critical

18   environmental concern" when amending plans.  The Right-of-Way allows Eagle Crest

19   to construct transmission lines through an area of land that was designated as an Area

20   of Critical Concern under the DRECP, and would disturb that area "above the

21   designated disturbance cap."  AR 10158.

22           Plaintiff here, just as in *Desert Protection Society*, argues that despite the

23   project-specific plan amendment, the Right-of-Way still needs to comply with the

24   DRECP, which it claims does not, and that the project-specific amendment conflicts

25   with the DRECP's instruction to give priority to Areas of Critical Concern.  Defendants

26   once again argue that because FERC withdrew and granted a license to the lands for

27   the Right-of-Way before the DRECP was implemented, Eagle Crest had a valid existing

28   right to the Right-of-Way which predates the DRECP.  Therefore, Defendants argue,

1    the DRECP regulations are inapplicable or unenforceable to the extent they would

2    interfere with Eagle Crest's valid existing right.  But, this Court has already found in

3    Defendants' favor that the neither the Right-of-Way, nor any part of the Project, are

4    covered by the DRECP.  *Desert Protection Soc'y*, 2023 WL 6386901, *15–16 ("The

5    Court finds that BLM complied with the relevant land use standards when amending

6    the land use plan and granting the right-of-way because Eagle Crest had a valid

7    existing right which exempted it from the otherwise inconsistent Renewable Energy

8    Plan land use standards.").

9         Relatedly, Plaintiff argues that FLPMA, the CDCA, and the CDCA Plan impose

10    substantive duties on BLM, which Plaintiff assert the BLM violated in approving the

11    issuance of the Right-of-Way.  FLPMA requires BLM "take any action necessary to

12    prevent unnecessary or undue degradation" of the lands its manages and to give

13    "special management attention" to Areas of Critical Concern.  43 U.S.C. §§ 1732(b),

14    1701(a)(11), 1702(a); *see* AR 005497.  The CDCA protects "rare and endangered

15    species of wildlife, plants, and fishes, and numerous archeological and historic sites"

16    that make up California desert region by requiring BLM to "conserve these resources

17    for future generations."  43 U.S.C. § 1781(a).  The Ninth Circuit defines "unnecessary

18    or undue degradation" as "harm to the environment that is either unnecessary to a

19    given project or violates specified environmental protection statutes."  *S. Fork Band

20    Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 723 (9th Cir.

21    2009).

22         Plaintiff once again asserts BLM's approval of the Right-of-Way's effects on

23    desert tortoise and bighorn sheep populations are in violation of FLPMA, the CDCA,

24    and the CDCA plan.  Plaintiff's arguments here are parallel to their previous

25    arguments regarding the environmental impacts of the Right-of-Way on the local

26    desert tortoise and bighorn sheep populations, and are in contradiction of this Court's

27    previous findings in *Desert Protection Society*, as discussed.  But, this Order has

28    already discussed Plaintiff's arguments regarding threats to the desert tortoise and

1  bighorn sheep, and why those arguments are unavailing.  BLM has properly

2  accounted for any impacts on these wildlife populations and did so by permissibly

3  tiering to the 2012 FERC EIS.  Plaintiff cannot attack these decisions on the backend,

4  especially after this Court has rejected similar claims in a parallel action and rejected

5  the claims in this Order. Therefore, Plaintiff's claim must fail.

6  **CONCLUSION**

7       For the above reasons, IT IS HEREBY ORDERED that Defendants' and Intervenor

8  Defendant's Motions for Summary Judgment (ECF Nos. 56 and 57) are GRANTED in

9  full, and Plaintiff's Motion for Summary Judgment is DENIED (ECF No. 55) in full.

10       The Clerk of the Court is DIRECTED to enter judgment in favor of all Defendants

11  and Intervenor-Defendant and close this case.

12

13       IT IS SO ORDERED.

14  Dated:   __**August 29, 2025**__

15  Hon. Daniel J. Calabretta

16  UNITED STATES DISTRICT JUDGE

17

18  DJC5 – NPCS 224cv01434.msj

19

20

21

22

23

24

25

26

27

28